Aerotek, Inc., sued Michael Burton, its former employee, in the Circuit Court of Montgomery County, seeking to recover liquidated damages for breach of a covenant not to compete. After an ore tenus proceeding, the trial court entered a judgment in favor of Burton. Aerotek appeals. We reverse and remand with instructions.
Aerotek is known as a "technical service firm" (a "TSF") — a firm that acts as a middleman to provide highly skilled, technically trained workers to its clients on a contract basis. The technical-service industry is a variation of the traditional employment-services industry.
Aerotek also provides traditional employment-agency services when requested to do so. In addition, when one of Aerotek's clients wants to directly employ an Aerotek employee who previously has been placed with that employer on a contract basis, Aerotek charges the client a "buy-out" fee of 30% of the employee's first-year salary.
Aerotek's clients typically have needs for highly skilled employees for periods ranging from a few days to a few years. When Aerotek is made aware of a need, it (i) conducts a search for candidates with a required skill-set, (ii) recruits those persons, (iii) internally interviews them, (iv) conducts reference checks, (v) conducts background checks, (vi) has the prospective employees tested for drugs and, assuming the results of the foregoing are satisfactory, (vii) submits a candidate's résumé and reports of its reference checks on the candidate to its client for the client's consideration. Aerotek's investment of time and effort is at no up-front cost to the employee or to Aerotek's client. Assuming Aerotek's client desires to engage the services of Aerotek, it agrees to compensate Aerotek at an agreed-upon rate that is higher than the wage Aerotek will pay to the employee, and Aerotek then enters into a contract of employment with the employee. Although the employee performs services for Aerotek's client, typically at the client's facility, the person is employed by Aerotek for all purposes.
In 1997, Storage Technologies and BellSouth needed a computer networking technician to work at a BellSouth facility near Birmingham for a period of one to two years. Storage Technologies is a business that manufactures and sells computer-storage products, and it had contracted to do a project for BellSouth at BellSouth's facility. Storage Technologies contacted Enterprise Solutions to have Enterprise Solutions assist it in locating an individual to fill the position; Enterprise Solutions, in turn, contacted Southern Network Services. Eventually, Southern Network Services contacted Aerotek for assistance in filling the Storage Technologies/BellSouth position.
After Burton had had a successful interview with Aerotek, after Aerotek had gotten acceptable results in background and reference checks, and after Burton had undergone a drug test with satisfactory results, Aerotek forwarded Burton's résumé and reports of its reference checks to Southern Network Services. Burton's résumé and reference-check reports were, in turn, forwarded to Storage Technologies *Page 200 
and to BellSouth. Ensuing interviews of Burton by Southern Network Services and Storage Technologies were positive, and, as a result, on December 8, 1997, Burton entered into the employment agreement with Aerotek, pursuant to which he then began work at the BellSouth facility. In accordance with their customary practice and the practice in the industry, Southern Network Services, Enterprise Solutions, and Storage Technologies each tacked on additional fees for Burton's services, and the final bill was paid by BellSouth.
In consideration of being employed by Aerotek for the work at the BellSouth facility, and to protect Aerotek's investment incurred in employing and placing Burton, Burton agreed in his employment contract with Aerotek that he would not solicit
 "[Southern Network Services] or engage in a like or similar profession or occupation at [Southern Network Services'] facility or any other facility at which [Burton was] directed to or actually perform[ed] services under this agreement, either directly or indirectly, for a period of one hundred eighty (180) days following the termination of [his] employment under the terms of this agreement, unless specific written authorization has been obtained from Aerotek."
(Emphasis added.) In the event, within 180 days following the termination of his employment with Aerotek, Burton chose to engage in similar work at "any . . . facility at which [he] . . . actually perform[ed] services under [the] agreement," then the agreement required Burton to compensate Aerotek pursuant to the following formula:
 "An amount equal to three hundred twenty (320) hours at the hourly rate as stated in 3(a) above [$20.00/hr.] as compensation for Aerotek's efforts and costs incurred in connection with [Burton's] employment [under the agreement]."
Burton violated his covenant when he unilaterally terminated his employment with Aerotek in August 1998 and immediately thereafter began performing the same work at the same facility, and for the same ultimate clients, Storage Technologies and BellSouth, at which he had been placed to work as an employee of Aerotek.[1] *Page 201 
Section 8-1-1, Ala. Code 1975, provides, in pertinent part:
 "(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.
 "(b) . . . [O]ne who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the . . . employer carries on a like business therein."
In Clark v. Liberty National Life Insurance Co., 592 So.2d 564 (Ala. 1992), our Supreme Court held:
 "The courts will enforce a covenant not to compete that fits within the exception of § 8-1-1(b) only if:
"`1. the employer has a protectable interest;
 "`2. the restriction is reasonably related to that interest;
 "`3. the restriction is reasonable in time and place; [and]
 "`4. the restriction imposes no undue hardship [on the employee].'
 DeVoe v. Cheatham, 413 So.2d 1141, 1142 (Ala. 1982). An interest is a protectable interest when an employer possesses `a substantial right in its business sufficiently unique to warrant the type of protection contemplated by [a] noncompetition agreement.' DeVoe, 413 So.2d at 1142 (quoting Cullman Broadcasting Co. v. Bosley, 373 So.2d 830, 836 (Ala. 1979)). A protectable interest may exist when an employee is `in a position to gain confidential information, [to gain] access to secret lists, or to develop a close relationship with clients.' DeVoe, 413 So.2d at 1143; see also Restatement (Second) of Contracts § 188, Comment B (1981)."
592 So.2d at 565-66 (emphasis added).
We note that the trial court's judgment in favor of Burton contained no express factual findings. In the absence of express findings, this court presumes that the trial court made, from the evidence presented at trial, those findings that would have been necessary to support its judgment.See Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A.,608 So.2d 375, 378 (Ala. 1992). Thus, in this case, we will presume that the trial court found that one or more of the four conditions specified in Clark, supra, was not satisfied. However, the record in this case does not support such a finding.
First, Aerotek had a protectable interest in being compensated for the services it provided. As noted, in hiring and placing prospective employees, Aerotek searches for and recruits candidates, interviews them, conducts reference checks and other background checks, tests for drugs, and makes the necessary arrangements for their placements, all without any up-front costs to either the prospective employee or the prospective client. Without the ability to protect itself from "disintermediation" (the employee's leaving his employment with the agency to work directly for the client), Aerotek and other providers of such employment services would soon find themselves providing their services at no cost to employees and clients.
Burton contends that the various intermediate contracts in the chain between Aerotek and Storage Technologies serve to alter or to dilute Aerotek's *Page 202 
protectable interest.[2] Burton and Aerotek are not parties to those other employment contracts, however. The contract between Burton and Aerotek clearly and unambiguously provides for stipulated damages in the event Burton, within 180 days following the termination of his employment with Aerotek, engages in a similar profession or occupation at "any . . . facility at which [Burton was] directed to or actually perform[ed] services under this agreement, either directly or indirectly." This court will apply unambiguous contract language as it is written. E.g., F.W.Woolworth Co. v Grimmer, 601 So.2d 1043, 1044 (Ala.Civ.App. 1992) ("When the agreement is certain and clear . . . [t]he words of the agreement are to be given their ordinary meaning, and the intentions of the parties are to be derived from the provisions of the agreement.")
Further, if Burton's position were to be accepted, then Aerotek and other employment agencies effectively would be foreclosed from providing employees to other agencies because they could not be assured of any return on their investment. If an employment agency's contractual rights as to its employee could be altered by the nature of "downstream" contracts in the chain between the agency and the ultimate client, then employment agencies could protect their investment of time and effort only where they supplied employees directly to the end users of the employee's services. Such a result would work against the public interest in the efficient employment of labor recognized in cases relied upon by Burton.[3] Employment agencies would have a disincentive to work effectively with other agencies to help satisfy employers' needs for labor and individuals' needs for gainful employment.
Second, the restriction placed on Burton by his employment agreement with Aerotek is "reasonably related to [Aerotek's] interest." Had Burton been placed directly with Storage Technologies at the outset as Storage Technologies' direct employee, a fee of 30% of Burton's first year's salary would have been payable to Aerotek under its standard agreement. The stipulated damages for which Burton is obligated under the terms of his agreement are only about half that amount — eight working weeks' worth. *Page 203 
Third, the restriction at issue is reasonable in time and place. As applied to the facts of this case, it is limited not to a geographic territory, but to Burton's work for a single employer at a single facility, and for a period of only 180 days.[4]
Fourth, the restrictive covenant imposes no undue hardship on Burton. Upon voluntarily terminating his employment with Aerotek, Burton was free to secure similar employment with any other employer at any location in Alabama, both within and without the Birmingham area.
Applying an analytical framework parallel to that employed by Alabama courts, the United States Court of Appeals for the Eleventh Circuit, inConsultants Designers, Inc. v. Butler Service Group, Inc.,720 F.2d 1553 (11th Cir. 1983), addressed a similar restrictive covenant in a case involving the same temporary-services industry at issue in this case. In an opinion that discusses at length the nature of the industry and the risk of disintermediation by "job shoppers," the Eleventh Circuit upheld a restrictive covenant that prevented an employee, for a period of 90 days, from terminating his employment with the TSF and accepting direct employment with the TSF's client. Like the covenant at issue in the present case, the restrictive covenant in Butler Service Group
provided that the employee could not accept employment "directly or indirectly" at the "specific client worksite at which [the TSF had] placed the individual employee." In reversing the judgment of a lower court that had refused to enforce the covenant, the Eleventh Circuit explained that the TSF had a protectable interest as a middleman:
 "In a pristine world in which information is costless, there would be no need for the essential service that Butler performs. The client firms and the prospective employees would each know what the other has to offer and could negotiate a contract instantaneously and costlessly. . . .
 ". . . Eliminating the middleman is at first blush a facile and attractive alternative. However, middlemen exist because they provide a useful and highly-valued service. If Butler's covenant with its job shoppers is to have any justification, that justification must be to protect Butler's role as a middleman in the market for information between job shoppers and client firms.
 "[Once a job shopper has been placed by a technical-services firm], barring some form of contractual constraint, the client firm and the job shopper could sever their relationships with the TSF and consummate a relationship with one another. The job shoppers and client firms could thereby opportunistically appropriate the work product of the TSF without paying it the full value of its services. If the TSF is to receive a reward for the services of the job shopper proportional to the latter's contribution to the client firm, the TSF must find some contractual means to protect its future income stream from the ravages of opportunistic disintermediation." *Page 204 
720 F.2d at 1558 (emphasis added; footnote omitted).
The Eleventh Circuit also held that the restriction in Butler ServiceGroup was reasonably related to the interest that the TSF sought to protect: "The covenant between Butler and [its client] not to hire one another's employees and the restrictive covenants in Butler's contracts with its job shoppers were clearly crafted to prevent such disintermediation." Id. at 1559. Likewise, the Court of Appeals concluded that the time and area restrictions were reasonable, noting that it "would be difficult to conceive of a more limited post-employment covenant." Id. at 1557.
Finally, the Butler Service Group court concluded that any hardship on the employee was outweighed by the potential hardship to the TSF and to the public:
 "By protecting the future stream of income that Butler would receive from its job shoppers, Butler was induced to invest more in searching for job shoppers than it otherwise would. Thus the public at large can be expected to gain from the enforcement of this and similar restrictive covenants to the extent that these covenants encourage optimal investment."
Id. at 1560.
Butler Service Group, while not binding on this court, constitutes persuasive authority.
We conclude that the trial court's judgment in favor of Burton was "plainly and palpably wrong." Transamerica, supra. Consequently, we reverse the judgment of the trial court and remand the cause for the entry of a judgment in favor of Aerotek consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Crawley and Pittman, JJ., concur.
Yates, P.J., and Thompson, J., dissent.
[1] Burton testified that, from the outset of his employment with Aerotek, he understood that he was being directed to work with Storage Technologies at the BellSouth facility. Although the dissent suggests that, when Burton terminated his employment with Aerotek in August 1998, he began work on a new project out of his Montgomery home, Burton's testimony indicates that he continued doing the same work at the same location:
 "Q. Can you tell me why you stopped working with Aerotek?
 "A. Well, the folks at Storage Tech had decided that they were going to get rid of the subcontractors and just have their own employees at the location. . . .
". . . .
 "Q. And they had permanent positions open directly through Storage Tech, they were cutting out the middleman?
"A. Yes.
". . . .
 "Q. And it was the same work that you performed while you were being contracted through Aerotek?
"A. Yes.
 "Q. I am piecing all of this together. So you commuted between Birmingham and Montgomery on a regular basis?
"A. Yes.
 "Q. Oh goodness. And now you have a home office, you don't have to go into your Birmingham location on a regular basis?
"A. That's correct.
In his brief to this court, Burton asserts only that "at the time of his deposition, Burton testified that he no longer worked at the BellSouth facility in Birmingham, although he is occasionally required to attend meetings at the Birmingham branch." Burton's deposition, however, was given over a year after he terminated his relationship with Aerotek and well beyond the 180-day restrictive period at issue. It also should be noted that the covenant restricts Burton from performing services at the BellSouth facility "either directly or indirectly."
[2] Burton asserts that he was actually an employee of Enterprise Solutions. He makes this assertion based on the testimony of a Storage Technologies manager who testified that, at the time he interviewed Burton, it was his "assumption that [Burton] would be working for Enterprise Solutions, who was a subcontractor to [Storage Technologies] for resources and recruitment." However, Burton had no employment contract with Enterprise Solutions and the same manager also testified that he did not know whether Enterprise Solutions had contracted with any other party to provide Burton as an employee. Storage Technologies may have a provision in its contract with Enterprise Solutions that would allow Storage Technologies to hire employees directly after a period of six months without any additional recruiter fees. Such an agreement, however, would be solely between Storage Technologies and Enterprise Solutions. Neither Aerotek nor Burton is a party to any such agreement; the relationship between Aerotek and Burton is governed by the contract between them. The fact that Storage Technologies might have the option, as between it and Enterprise Solutions, to hire Burton without paying any additional fees to Enterprise Solutions has no bearing on Burton's obligation under his contract with his employer, Aerotek, in the event he accepts direct employment at the facility at which Aerotek was responsible for placing him.
[3] For example, Burton relies upon our Supreme Court's observation inClark that "[c]ontracts restraining employment are disfavored `because they tend not only to deprive the public of efficient service, but [also] . . . to impoverish the individual.'" Clark v. Liberty Nat'l Life Ins.Co., 592 So.2d 564, 565 (Ala. 1992) (citations omitted).
[4] Although the facts of every case are different, and each case must be decided on its own merits, our courts often have upheld covenants with time and geographical restrictions that are much greater than those at issue here. See, e.g., Clark, supra (one-year limitation on solicitation of Liberty National policyholders); James S. Kemper Co. v. Cox Assocs., Inc., 434 So.2d 1380 (Ala. 1983) (two-year restriction on solicitation of the employer's customers throughout Alabama); Rush v.Newsom Exterminators, Inc., 261 Ala. 610, 75 So.2d 112 (1954) (two-year restriction); Central Bankshares of the South, Inc. v. Puckett,584 So.2d 829 (Ala. 1991) (two-year limitation on competition in the banking business by two of a bank's top officers held to be reasonable).