

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00044-CV
_____

LAZER SPOT, INC., Appellant

V.

HIRING PARTNERS, INC., Appellee

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 79914

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Hiring Partners, Inc. (HPI) and Lazer Spot, Inc. (Lazer Spot) filed competing motions for summary judgment in a suit brought by HPI. HPI's suit alleged that Lazer Spot had tortiously interfered with contracts between HPI and some of its employees. The trial court awarded summary judgment to HPI. Because we find no basis for the summary judgment granted in favor of HPI and because Lazer Spot was entitled to summary judgment as a matter of law, we reverse the judgment of the trial court and render judgment in favor of Lazer Spot.

I.      Background and Procedural Posture

HPI is in the business of recruiting workers for its clients for the performance of services required by those clients. HPI requires each of its employees to execute written employment contracts with HPI. While the form of these contracts vary somewhat, they each specifically state that the employees are at-will employees. In addition, each employment contract contains a ninety-day clause, which prohibits the employee from seeking "employment on a temporary, contract or permanent basis at any company where introduced by HPI for a period of ninety (90) days."

This case involves three at-will employees of HPI:  Mitch Templeton, Shanda McCalib, and Michelle Thoms (the employees), who were each hired to work as gate clerks/dock hands[1]

---

[1]Employees are periodically referred to in the record as gate clerks, dock clerks, or dock hands. As gate clerks/dock hands, the employees were responsible for checking in trucks when they arrived at the plant, checking in with truck

for Arnold Transportation Company (Arnold) at the Campbell's Soup plant in Paris, Texas, in 2010,[2] pursuant to Arnold's contract with Campbell's Soup to supply employees for these positions. The employees signed contracts with HPI wherein both the employer and employee acknowledged that the employees were in an employment at-will status and wherein the employees each agreed to be bound by the ninety-day noncompetition clause mentioned above.

Unbeknownst to HPI, Lazer Spot received a request from Campbell's Soup in approximately July 2010 to submit a proposal to provide truck spotting services at its Paris facility. While Lazer Spot was aware that Arnold had been providing these services up to that point, Lazer Spot was unaware that Arnold was utilizing temporary employees supplied by HPI to perform yard work (or truck spotting services). On October 7, 2010, Campbell's Soup awarded the contract for those services to Lazer Spot.[3] In mid-October, Lazer Spot received employment applications from the employees.[4] On October 19, Lazer Spot interviewed and offered employment to the employees to work as gate clerks/dock hands at the Campbell's Soup plant. At the time the employees were offered employment, Lazer Spot was unaware of the

drivers, gathering information, and entering certain data into a computer system. HPI's job description for the gate clerks/dock hands indicates the position is akin to that of a warehouse worker.

[2] The employees were hired to perform yard management services required by Arnold pursuant to a contract between Arnold and Campbell's Soup.

[3] HPI does not contend that Lazer Spot took any improper action in connection with bidding for and obtaining the services contract.

[4] The applications were dated October 14 and October 19. Each application indicated that the applicant was currently employed by HPI.

3

employees' written contracts for employment with HPI, contracts which included the noncompetition agreements.[5]

On October 19, after the employees interviewed with Lazer Spot and were offered employment by it, Dana Hill, the operations manager for HPI, telephoned Jerry Edwards, the vice president of operations for Lazer Spot. Hill advised Edwards that the employees were subject to employment contracts with HPI. Although Edwards indicated that he then requested that Hill send him a copy of the contracts, Hill did not do so. According to Hill, Edwards did not ask to see a copy of the contracts, even after she indicated her belief that the employees would breach their contracts and that Lazer Spot would be assisting in that breach if it hired the employees.

On October 23, Lazer Spot received a letter (dated October 21) from HPI's counsel, Larry Lesh, demanding that Lazer Spot cease its interference with the employment contracts between HPI and its employees. The letter neither described the contractual obligations owed HPI by the employees, nor included a copy of the referenced contracts. Because counsel for Lazer Spot was hospitalized shortly after the letter was received, no immediate response was made.

---

[5]HPI was unaware that Arnold's contract with Campbell's Soup was about to expire and that Lazer Spot was awarded the successor services contract.

4

On November 2, Lazer Spot commenced its operations at the Campbell's Soup plant and the employees began work for Lazer Spot "around this time."[6] Having received no reply to its October 21 letter, HPI filed suit against Lazer Spot on November 3, alleging that Lazer Spot tortiously interfered with HPI's employment contracts with the employees, seeking actual and exemplary damages.

On November 18 (after having been served with the lawsuit) Rhonda McCurtain, vice president of human resources and general counsel for Lazer Spot, called Lesh. According to McCurtain, she unconditionally offered to terminate the employment relationships of the employees so that HPI could rehire them.[7] McCurtain states that Lesh rejected this offer, indicating that HPI did not want to rehire the employees. Lesh claims that during the telephone conversation with McCurtain, he inquired whether Lazer Spot would pay a reasonable amount to settle the lawsuit. According to Lesh, McCurtain indicated that Lazer Spot would not pay any substantial amount to settle, but inquired whether Lazer Spot's termination of the employees would be an acceptable alternative to HPI. HPI did not find this alternative acceptable.[8]

---

[6]The affidavit of Hill indicates that the employees terminated their employment with HPI on October 31.

[7]McCurtain also requested copies of the employment contracts. Lesh indicated that he would refer the request to HPI, but did not believe it would be a problem.

[8]McCurtain received copies of the employment contracts on November 24.

On January 23, Lazer Spot filed a motion for summary judgment wherein it alleged that it had engaged in no tortious interference with HPI's contracts because the post-employment restrictive covenants are unenforceable as a matter of law, and the unenforceability of those covenants is a valid and absolute defense to HPI's tortious interference claim. Lazer Spot alleged in its motion (and re-urges on appeal), that the covenants not to compete are unenforceable because there was no legally enforceable consideration promised or provided to the employees that would support those promises. In addition, Lazer Spot alleged that HPI has no protectable interest because the employees are dock hands who engage in a common calling. Finally, Lazer Spot claimed the covenants are unenforceable because they are overly broad.[9]

HPI filed a competing motion for summary judgment, contending Lazer Spot tortiously interfered with the employment contracts between HPI and its employees, entitling HPI to damages and declaratory relief, citing authority it maintains supports the proposition that a contract for at-will employment is subject to interference. It contended that Lazer Spot interfered with the employment contracts with full knowledge of their existence and that such interference was willful and intentional, causing HPI damages in the aggregate amount of $47,684.83 as of December 31, 2011, with damages continuing to accrue thereafter for so long as employees were employed by Lazer Spot.

---

[9]Lazer Spot further claimed that it was unaware of the employees' contractual obligations, and hence there could be no tortious interference.

6

On March 12, the trial court entered its final summary judgment denying Lazer Spot's motion for summary judgment and granting HPI's motion for summary judgment. The judgment awarded HPI damages it requested in the amount of $47,684.83, representing damages caused by Lazer Spot through December 31, 2011, and further declared that the liability of Lazer Spot to HPI "shall continue from and after December 31, 2011 for so long as Mitchell Templeton, Shanda McCalib and Michelle Thoms remain employees of Defendant Lazer Spot." This appeal ensued.

## II.   Standard of Review

"When both sides move for summary judgment, as they did here, and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered." *Gilbert Tex. Constr.*, *L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citing *Embrey v. Royal Ins. Co. of Am.*, 22 S.W.3d 414, 415–16 (Tex. 2000)).

## III.   Appellate Issues

Lazer Spot's primary appellate point is based on the premise that its motion for summary judgment should have been granted because the noncompetition covenants were not enforceable as a matter of law. In support of this contention, Lazer Spot argues that HPI did not provide consideration to the employees in exchange for their purported agreement to be bound by the

7

covenants not to compete, and the noncompetition covenants are unlawfully broad with regard to the scope of activity they purport to restrain.  Because we find the noncompetition covenants are not supported by consideration, we need not address the argument regarding their scope or breadth.

Lazer Spot further contends (apart from any issue relating to the noncompetition agreements) that the trial court erred in denying its motion for summary judgment (and in granting HPI's motion) because there was no tortious interference with the employees' contracts, claiming the mere act of hiring an at-will employee who works for another is not tortious as a matter of law.  We agree.[10]

## IV.    Analysis

### A.    The Noncompetition Agreements Are Unenforceable

Lazer Spot initially maintains that the trial court erred in failing to grant its motion for summary judgment—and in granting HPI's motion—because the noncompetition agreements between HPI and its employees are unenforceable as a matter of law.  Because "covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference," Lazer Spot contends there is

---

[10]Lazer Spot raises additional appellate issues, including claims of justification in hiring the employees and of estoppel, the trial court's failure to strike HPI's first amended petition and certain summary judgment evidence, together with various complaints regarding the damage award included in the judgment.  Our reversal of the trial court's judgment in favor of HPI renders these issues moot.

8

no tortious interference.  *Juliette Fowler Homes*, *Inc. v. Welch Assocs.*, 793 S.W.2d 660, 665 (Tex. 1990).

The Covenants Not to Compete Act governs the enforceability of noncompetition agreements.  Tex. Bus. & Com. Code Ann. §§ 15.50–.52 (West 2011).  The enforceability of a covenant not to compete is a question of law.  *Mann Frankfort Stein & Lipp Advisors*, *Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We review the trial court's determinations of questions of law on a de novo basis.  *Barber v. CO Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex. 1995).

Section 15.50 provides in relevant part:

Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50(a).

Lazer Spot contends the noncompetition agreements are unenforceable because they are not "ancillary to or part of" an otherwise enforceable agreement as required under Section 15.50.  The requirement of an "otherwise enforceable agreement" is satisfied when the covenant is part of an agreement which contains mutual, nonillusory promises.  *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 773 (Tex. 2011).  An "otherwise enforceable" agreement "can emanate from at-will

9

employment so long as the consideration for any promise is not illusory." *Alex Sheshunoff Mgmt. Servs.*, *L.P. v. Johnson*, 209 S.W.3d 644, 648 (Tex. 2006). A noncompetition agreement must be supported by consideration to be enforceable. *Id.* at 651; *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 n.6 (Tex. 1990). "Consideration for a noncompet[ition] that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus." *Marsh*, 354 S.W.3d at 775. Here, Lazer Spot contends there was no consideration given to enforce the noncompetition agreements.

The covenant in question provides:

I agree not to seek employment on a temporary, contract or permanent basis at any company where introduced by Hiring Partners, Inc. for a period of ninety (90) days. I will not seek to induce any client to call other temporary or contract agencies for their temporary, permanent or project assignments. This means that I will not knowingly inform other services of Hiring Partners, Inc. clients and/or rates charged at these client companies. Nor will I discuss my hourly rate with other individuals working for Hiring Partners, Inc. nor other temporary or employment agencies.

Hiring Partners, Inc. realizes that clients may seek help from other temporary or employment agencies and, that I may also be called upon by another agency to fill other positions; however, I may not accept an assignment through another agency for a period of ninety (90) days at a firm/company that applicant has been introduced to by Hiring Partners, Inc.

Hiring Partners, Inc. reserves the right to replace a candidate working on assignment at its own discretion, without this signed agreement being altered in any way and considers such to remain in effect for a period of ninety (90) days from the date last worked by applicant.

10

All contracts specify that employment is "employment at will," meaning that either HPI or the employee "can terminate the employment relationship at any time, with or without cause, with or without notice."

There is no recitation of consideration in the contracts. The contracts identify neither confidential, proprietary, or trade secret information to be divulged, nor any goodwill or specialized training to be provided the employees in consideration for signing the contracts. The only implied consideration[11] is illusory—the consideration of at-will employment. This is insufficient. *See, e.g.*, *Martin v. Credit Protection Ass'n*, 793 S.W.2d 667, 669 (Tex. 1990) (holding employment agreement consisting entirely of covenant not to compete unenforceable because covenant "must be supported by valuable consideration"); *Sheshunoff*, 209 S.W.3d at 651.[12]

Likewise, the record fails to disclose the existence of any such consideration. Hill was asked whether there is "any confidential information that you can identify for the judge or jury

---

[11]Where the nature of the employment requires the employer to furnish the employee with confidential information, the employer impliedly promises to provide that information and that implied promise is sufficient consideration to support a covenant not to compete. *Fielding*, 289 S.W.3d at 852.

[12]Where an employer in an at-will employment agreement agrees to provide confidential information or other consideration to an employee, a reciprocal promise by the employee not to use the confidential information in competition with the employer may not be immediately enforceable because the employer's promise is illusory because he could terminate the employee before any confidential information is shared. But, once the employer fulfills the promise to divulge the confidential information, the contract becomes enforceable and may support a covenant not to compete. *See Sheshunoff*, 209 S.W.3d at 648–49. Thus, a covenant not to compete is not unenforceable under the Act solely because the employer's promise is executory when made. *Id.* at 655. Here, there is no allegation or claim that employees were, at any time, provided confidential information.

11

that Hiring Partners provided to these employees as a part of their employment with Hiring Partners?" Her response was "No." In addition, Hill testified that because she could not identify any confidential or proprietary information given to the employees, she could not identify any steps HPI took to ensure that such information remained confidential.[13]

HPI responds that "[c]onsideration for a noncompetition that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus" because "the purpose of the Act . . . was to expand rather than restrict the enforceability of such covenants" and "[t]he Act provides that 'goodwill' is a protectable interest." *Marsh*, 354 S.W.3d at 775–77.

HPI relies on Hill's testimony that the noncompetition agreements were designed to protect HPI's goodwill:

> Q. Can you identify for the judge or the jury what was the interest that Hiring Partners was seeking to protect through this 90-day clause?
>
> A. It's the nature of our business. If we don't have some rules to follow, then we could present employees to clients all day long every day and they could just hire them on their own. We would be out of business if we did not have guidelines to go by.

While *Marsh* does find that goodwill is a protectable interest, goodwill does not encompass guidelines that prevent the business from ceasing to exist (although some goodwill is

---

[13]Hill generally described the training provided to HPI employees as "vibes in the workplace training; harassment training; safety in the workplace; back protection; hearing protection; fire safety; lock out, tag out instructions; forklift safety." She could not recall the specific training given to any of the employees.

generally necessary for that aim).[14]  *Marsh* further requires consideration to support a noncompetition agreement.

In *Marsh*, the employer's managing director, Cook, was granted the option to purchase shares of stock in the Marsh entity pursuant to an incentive plan.  When the option was nearing expiration, Cook exercised his right to purchase company stock.  In conjunction with the purchase, Cook agreed that in the circumstance he left Marsh within three years, he would neither compete with Marsh nor solicit its employees.  Cook also agreed that he would maintain the confidentiality of Marsh's confidential information and trade secrets.  *Id.* at 767.  After leaving Marsh, Cook was sued for violating the covenant not to compete.

The Texas Supreme Court concluded that the noncompetition provision satisfied the requirements of the Act.  *Id.* at 780.  In doing so, it recognized that the award of stock options "linked the interests of a key employee with the company's long-term business interests."  *Id.* at 777.  In addition, "[o]wners' interests are furthered by fostering the goodwill between the

---

[14]"Goodwill" is defined as:

> the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*Marsh*, 354 S.W.3d at 777–78.

13

employer and its clients" and "stock options are reasonably related to the protection of this business goodwill." *Id.*

*Marsh* does not support HPI's claim that the covenants against employment by others in controversy here were necessary to protect its goodwill; *Marsh* involved a managing director who was successful in achieving and attracting business for the company, these long-term relationships being vitally important in the insurance brokerage industry. *Id.* at 776–77. The consideration for the protection of business goodwill was reasonably related to that protection. In contrast with *Marsh*, the employees here were blue collar workers[15] who signed noncompetition agreements in the absence of consideration.[16]

---

[15]The employees were responsible for checking in trucks, gathering information, and entering data into a computer system. HPI's job description for the gate clerks/dock hands says the job is akin to that of a warehouse worker. Lazer Spot thus contends that because the employees' positions only entailed generic work skills, this basic knowledge does not implicate a protectable interest under Texas law. *See Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 231 (Tex. App.—Texarkana 1998, no pet.) (general skills and knowledge developed through course of employment not type of interest which justifies protection under restrictive covenant). There is no evidence the employees received specialized training. When asked if HPI provided employees any training for the specific tasks they were to perform at Campbell's Soup, Jones stated that she had no idea.

[16]In addition to *Marsh*, HPI cites a number of cases from other jurisdictions finding disintermediation—a diversion of a company's business by eliminating the middleman—to be an interest worthy of protection. *See, e.g.*, *Volt Servs. Grp. v. Adecco Emp't Servs.*, 35 P.3d 329, 334 (Ore. App. 2001) (contacts between employer's employees and its customers can create protectable interest when nature of contact is such that there is substantial risk employee may be able to divert all or part of customer's business); *see also Aerotek, Inc. v. Burton*, 835 So.2d 197 (Ala. Civ. App. 2001) (employer had interest in protecting itself from disintermediation); *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F.Supp. 495 (E.D. Ky. 1996) ("disintermediation" worthy of protection where considerable time, effort, and money spent in training employees). In light of Texas' statutory restrictions governing the enforceability of noncompetition agreements, we do not find this authority persuasive.

Because the restrictive covenants here were not supported by consideration independent of the simple act of hiring under an at-will agreement, they are not "ancillary to or part of" an otherwise enforceable agreement under Section 15.50. TEX. BUS. & COM. CODE ANN. § 15.50(a). Those "covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Juliette Fowler Homes*, 793 S.W.2d at 665. Thus, unenforceability of a noncompetition covenant is a valid defense to a claim of tortious interference. *Id.*;[17] *see also Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 833 (Tex. 1991), *superseded by statute*

---

[17]In *Juliette Fowler Homes*, Fowler, a nonprofit organization, entered into a fund-raising contract with Welch, whereby Welch agreed to conduct a fund-raising campaign for the benefit of Fowler. Welch contracted with Butler to help execute the Fowler fund-raising campaign. The contract between Welch and Butler contained a covenant not to compete which bound Butler not to "enter into any form of contract for services" with any of Welch's clients for a period of two years after the conclusion of the Butler-Welch contract. *Juliette Fowler Homes*, 793 S.W.2d at 661. Thereafter, Fowler terminated its contract with Welch. Butler also terminated its contract with Welch. Butler was then hired by NBA, one of whose agencies is Fowler. Butler was assigned to work with Fowler, and to supervise its fund-raising campaign. As a result, Welch sued Fowler, alleging breach of the Welch-Fowler contract and further alleging breach of the noncompetition clause. Welch also sued Butler for breach of the noncompetition clause of the Butler-Welch contract and for tortious interference with Welch's contractual relations with Fowler.

     The jury found that Butler breached the noncompetition clause of the Butler-Welch contract by accepting the position with NBA. The court found that the noncompetition clause was unenforceable and that Welch could therefore not recover for Butler's breach of the Butler-Welch contract (the clause contained no limitations concerning geographical area or scope of activity).

     The jury found that Fowler tortiously interfered with Welch's contractual relationship with Butler. Fowler argued that the noncompetition clause in the Butler-Welch contract was an unreasonable restraint of trade and unenforceable on the grounds of public policy. Fowler therefore claimed that its actions "inducing" Butler to accept the position with NBA cannot support a judgment for tortious interference. The Texas Supreme Court indicated that "this argument presents the narrow issue of whether the unenforceability of the noncompetition clause in the Butler-Welch contract is a defense to Welch's action against Fowler for tortious interference with contractual relations." *Id.* at 664. After determining that the unenforceability of the noncompetition clause was a defense to Welch's tortious interference claim, the court held "that covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Id.* at 665.

*on other grounds as stated in Sheshunoff*, 209 S.W.3d at 653 n.5. Therefore, to the extent HPI's tortious interference claim is premised on breach of the noncompetition agreements, such claim cannot stand. HPI contends, however, that tortious interference exists here, independent of any issue relating to the noncompetition agreements.

**B.** **The Mere Hiring of an at-Will Employee Cannot, Without More, Give Rise to a Tortious Interference Claim**

HPI relies on *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989), to claim that even though the employment contracts were terminable-at-will, they are nevertheless subject to a cause of action for tortious interference. *See also Crouch v. Trinque*, 262 S.W.3d 417, 425–26 (Tex. App.—Eastland 2008, no pet.) (cause of action exists "for tortious interference with a contract of employment terminable at will").

Lazer Spot's response to this argument is two-fold.

The first part of Lazer Spot's argument zeroes in on the fact that Jones (HPI's president) testified that the only portions of the contracts HPI alleges were violated are the noncompetition covenants. When asked what part of the agreement the employees violated, Jones pointed to the following language, "I may not accept an assignment through another agency for a period of 90 days, at a firm/company that applicant has been introduced to by Hiring Partners." Jones further explained, "[T]he contractual obligation is . . . that the employee cannot go to a company where we have introduced them. So that is what is in violation. They are certainly at-will employee[s]

and can go to anybody else but some place where we've introduced them to, because that's our business." Lazer Spot seeks to hold HPI to this testimony and restrict the tortious interference issue to the noncompetition clause.[18] In doing so, Lazer Spot prevails, because the noncompetiton clause is unenforceable and thus will not support a tortious interference claim.

In its second point, Lazer Spot contends that when stripped of any protection the subject noncompetition agreements might otherwise provide, the remaining contract is nothing more than the written memorialization of a common law at-will employment relationship. Proceeding from that premise, Lazer Spot says that the mere hiring of an at-will worker who is currently employed by another, does not constitute actionable interference.

HPI does not concede the noncompetition agreements are unenforceable; even so, they place great reliance on *Sterner* and its progeny. However, the holding in *Sterner* is limited: at-will contracts are protected from tortious interference.[19] Lazer Spot contends it is not tortious interference to induce a contract obligor to do what it has a right to do. In *ACS Investors*, *Inc. v.*

---

[18]HPI's original petition alleges, "[T]he willful and malicious acts and conduct of Lazer Spot described above constitute tortious and unlawful interference with the contracts of employment between HPI and employees of HPI." While the petition never mentions the noncompetition clauses, it does describe the recruiting and testing of employees and their placement with Arnold.

[19]HPI suggests that *Juliette Fowler Homes* did not modify *Sterner* because it did not involve an employment contract. We disagree. *Sterner* held that the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance. *Sterner*, 767 S.W.2d at 689. *Fowler* recognized that "even an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void," and emphasized that "mere unenforceability of a contract is not a defense to an action for tortious interference with its performance." *Juliette Fowler Homes, Inc.*, 793 S.W.2d at 664. The court then created an exception to the general rule and held that a tortious interference claim may not be grounded on a contract that was "void or illegal," or where there is "any public policy opposing its performance." *Id.* at 664–65.

17

*McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997), the high court recognized that "[o]rdinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." After this quote, the Texas Supreme Court signaled, "*but cf. Sterner v. Marathon Oil Co.*, 787 S.W.2d 686 (Tex. 1989)." *Id.* HPI contends that by preceding the citation of *Sterner* with the "*but cf.*" signal, the high court signified that the quoted statement in *ACS Investors* was inapplicable to *Sterner* which, unlike *ACS Investors*, involved tortious interference with an employment relationship.

In *Sterner*, an employee of Marathon (Sterner) prevailed in a suit against Marathon following an accident. *Sterner*, 767 S.W.2d at 688. Sterner then took a job with a different company at a drilling site. Sterner's new employer was under contract with Marathon. When a Marathon supervisor noticed Sterner on the job site, he instructed Sterner's new employer to fire Sterner. *Id.* The high court held that it was tortious interference for Marathon to induce Sterner's employer to terminate its at-will contract with Sterner. *Id.* at 691.

While *Sterner* appears to be at odds with *ACS Investors*, it has been postulated that an explanation for this apparent inconsistency is the fact that

> Marathon's contract with Sterner's employer specifically yielded all managerial decisions to the employer. Marathon induced the employer to do what it had a right to do (i.e., terminate at will). In this case, however, Marathon breached its contract with Sterner's employer by making a demand that violated the terms of the Marathon-employer agreement. Marathon's acts violated its agreement with Sterner's employer and thus exceeded its right to interfere with the contract between Sterner and his employer.

18

Sean Farrell, *Applying Tortious Interference Claims to at-Will Contracts*, 39 TEX. J. BUS. L. 527, 532 (Winter 2004) (footnotes omitted) (citations omitted). If one accepts this distinction, it does not follow that *ACS Investors* is necessarily at odds with *Sterner*.

Additional authority cited by HPI does not support its position that an at-will employee cannot be induced to do what he otherwise has a right to do (i.e., terminate employment at any time). For example, in *Crouch*, the tortious interference claim was based on allegedly defamatory comments that led to termination of the plaintiff's at-will employment. Summary judgment on the tortious interference claim was upheld because the affirmative defense of justification was not pled. *Crouch*, 262 S.W.3d at 426. The remaining authority[20] cited by HPI in support of its contention that at-will employment is subject to tortious interference likewise involved claims based on allegedly defamatory comments regarding the plaintiff, which resulted in the plaintiff's termination of employment.[21] In each of these cases, a third party allegedly interfered, and the plaintiff was fired. In this case, however, the employees quit their jobs, as

---

[20]*De Mino v. Chu*, No. 01-03-01127-CV, 2005 WL 2123537 (Tex. App.—Houston [1st Dist.] Aug. 31, 2005, pet. denied) (mem. op.); *Armijo v. Mazda Int'l*, No. 14-03-00365-CV, 2004 WL 1175335 (Tex. App.—Houston [14th Dist.] May 27, 2004, pet. denied) (mem. op.); *Albertsons, Inc. v. Hufnagle*, No. 05-01-00573-CV, 2002 WL 1964236 (Tex. App.—Dallas Aug. 26, 2002, no pet.) (not designated for publication).

[21]Based on this authority, Lazer Spot takes the position that there must be some independent misconduct (other than the mere loss of at-will employment) before tortious interference may be considered. The Texas Supreme Court has held that to establish liability for interference with a prospective contractual or business relation, the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

they had every right to do. There is no evidence of wrongful conduct by Lazer Spot, such as defamation or breach of an obligatory contractual provision.[22]

*Graham v. Mary Kay Inc*., 25 S.W.3d 749 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), highlights the distinction between inducing someone to terminate at-will employment and interfering with at-will employment contracts. In that case, Graham appealed an injunction preventing her from selling Mary Kay cosmetics at her retail location. The Mary Kay consultants were required to sign an agreement with Mary Kay to only sell directly to the consumer. Graham maintained that because the consultants were at-will employees, it was not tortious interference to induce them to transact business with her. Graham did not induce the

---

[22]A party seeking to establish tortious interference with a contract must prove four elements: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. A defendant may defeat a tortious interference claim on summary judgment by disproving one element of the claim as a matter of law. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455 (Tex. 1998); *Archives of Am., Inc. v. Archive Litig. Servs., Inc*., 992 S.W.2d 665, 666–67 (Tex. App.—Texarkana 1999, pet. denied). The disputed element here is that of "willful and intentional" interference. To establish a willful and intentional act of interference, there must be evidence that the defendant was more than a willing participant—the defendant must have knowingly induced one of the contracting parties to breach its obligations under a contract. *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

To support its claim of "willful and intentional" interference, HPI contends that despite Lazer Spot's claimed lack of knowledge of the ninety-day clause (there is no evidence Lazer Spot knew about the ninety-day clause when it hired the employees on October 19), Lazer Spot was fully aware that employees were employed by HPI at the time it hired them because: (1) the employment applications listed HPI as the current employer, giving Lazer Spot actual notice of the status of those applicants as employees of HPI; and (2) on October 19, the date the employees were interviewed and offered employment, Hill advised Edwards that the employees were "under contract" with HPI and that Lazer Spot "would be assisting them in breaching the contract if" Lazer Spot hired them. Hill admits the telephone conversation with Edwards took place after Lazer Spot interviewed the employees and offered them employment. Further, Lazer Spot contends there is no evidence it was aware of any of the employees' contractual obligations when it hired them, and HPI provided no evidence to prove otherwise. We agree. Even if Lazer Spot was aware of the contractual provisions between HPI and its employees, nothing in those contracts prevented Lazer Spot from hiring the employees.

20

consultants to leave their employment. "The object of the interference was . . . not in inducing a switch in contractual relations, but in exploiting contractual relations to Graham's benefit (and Mary Kay's detriment)." *Id*. at 754. Because Graham induced the consultants to do something they had no right to do under their contracts with Mary Kay, she tortiously interfered with those contracts. *Id*.

Outside of the realm of allegedly defamatory statements made by third parties that result in termination of at-will employment (where inducement is apparently tortious because it is accomplished via defamation), other actionable interference appears to hinge on violation of a contractual provision, other than the at-will provision. *See Sterner*, 787 S.W.2d at 691 (Marathon not justified to interfere because directive to fire Sterner exceeded terms of Marathon-employer agreement); *Graham*, 25 S.W.3d at 754 (breach of direct sales clause in employees' agreements with Mary Kay).

Because a claim of tortious interference cannot be premised merely on the hiring of an at-will employee, without more, summary judgment was improperly granted on the claim of tortious interference with contractual relations; the employees were within their rights to terminate employment with HPI at any time.[23]

---

[23]If the mere hiring of an at-will employee, without more, were sufficient to support a claim of tortious interference, the economy in the State of Texas would soon grind to a halt.

## V.     Conclusion

Because the noncompetition covenants in this circumstance are unenforceable, and because there is otherwise no tortious interference with the contracts between HPI and the employees, we reverse the judgment of the trial court.  Further, because Lazer Spot was entitled to summary judgment as a matter of law, we render judgment in favor of Lazer Spot.  Lazer Spot is not, however, entitled to recover attorney's fees and court costs.[24]

Bailey C. Moseley
Justice

Date Submitted:     September 26, 2012
Date Decided:      October 18, 2012

---

[24]Lazer Spot claims that it should have been awarded attorney's fees as a part of its summary judgment, pursuant to Section 15.51(c) of the Texas Business and Commerce Code:

> If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

TEX. BUS. & COM. CODE ANN. § 15.51(c).  The foregoing provision permits the "promisor" to recover costs and reasonable attorney's fees, in certain circumstances.  Because the express language of the statute does not apply here, Lazer Spot is not entitled to attorney's fees under Section 15.51(c).  TEX. BUS. & COM. CODE ANN. § 15.51(c); *see Glattly v. Air Starter Components, Inc*., 332 S.W.3d 620, 645 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (Covenants Not to Compete Act does not permit employers to recover their attorney's fees in suits to enforce their rights under the Act).  We find no authority to support the proposition that a third party, such as Lazer Spot, is entitled to attorney's fees pursuant to this section of the statute.