VANESSA D. GILMORE, UNITED STATES DISTRICT JUDGE
Pending before the Court are Plaintiff and Counter-Defendant GE Betz, Inc., d/b/a GE Water & Process Technologies ("GE" or "Plaintiff")'s Motions for Summary Judgment on Defendants' counterclaims for business disparagement (Instrument No. 71 ) and tortious interference with customer contracts (Instrument No. 72 ) and employment contracts (Instrument No. 73 ). Also pending is Defendants and Counter-Plaintiffs AMSPEC Services, L.L.C. ("AmSpec") and Michelle Moffitt-Johnston ("Moffitt") (collectively, "Defendants")'s Motion for Summary Judgment on Plaintiff's claims (Instrument No. 74 ).
I.
A.
Moffitt was previously employed by GE's distressed fuels team, which provides chemistry and services to upgrade fuel for export. Moffitt founded GE's distressed fuels team in 2009, and left GE to become *678 a Vice President at AmSpec in 2012. GE has brought thirteen causes of action against Moffitt and AmSpec, alleging that Moffitt has breached the non-solicitation provision of her Employment Contract with GE and that Moffitt and GE have disclosed trade secrets, breached various fiduciary duties, and competed unfairly, among other claims. AmSpec and Moffitt have brought counterclaims against GE, alleging that GE has tortiously interfered with their employment agreement and disparaged their business.
B.
Moffitt was hired at Betz Laboratories, which eventually came to be owned by GE, as a phase separation engineer in 1996. (Instrument No. 74-1 at 4-5). In approximately 2009, Moffitt became the first leader of GE's Distressed Fuels Team ("DFT"), which performs chemical and fuel treatments on ships, called cargo treatments, and in storage tanks and terminals. (Instrument No. 74-1 at 6-7, 8-9). GE's DFT consisted of Moffitt, six sales people, and fourteen technicians who performed treatments at customer sites. (Instrument No. 74-1 at 10). Each treatment was inspected by a third party, like AmSpec, which conducted inspections and laboratory testing to ensure that the final product met desired specifications. (Instrument No. 74-2 at 10). GE's DFT and AmSpec's inspection and testing team often marketed to the same customers and engaged in joint marketing efforts, such as renting a yacht for a yearly customer appreciation cruise at the New York Harbor Show. (Instrument No. 74-2 at 3).
In connection with her employment at GE, Moffitt executed an employment contract titled, "GE Infrastructure Water & Process Technologies Employment and Confidential Information Agreement" (the "Employment Agreement"). (Instrument No. 74-9 at 2-5).[1] As part of the Employment Agreement, she agreed that she would have access to trade secrets, proprietary information and confidential information (collectively referred to in the Agreement as "confidential information"). (Instrument No. 74-9 at 2, Section I(A) ). The Employment Agreement defined this confidential information as "any information ... regarding the Company, its business, its plans, its customers, its contracts, its suppliers, its products and its strategies, that is not generally known, provides the Company an actual or potential competitive advantage over those who do not know it, and is the subject of reasonable measures to maintain secrecy." (Instrument No. 74-9 at 2, Section I(A) ). Moffitt agreed to hold confidential information in trust both during and after her employment with GE. (Instrument No. 74-9 at 2, Section II(A) ).
In addition to provisions concerning non-disclosure of confidential information, Moffitt agreed to a non-solicitation covenant regarding customers and prospective customers. The Agreement defines "customer" broadly as any current customer of GE, including any of its employees, with whom Moffitt had contact or learned confidential information during the eighteen months prior to the termination of her employment. (Instrument No. 74-9 at 2, Section I(B) ). The Agreement defines "prospective customer" as any entity Moffitt assisted in making a written proposal for or any entity Moffitt made two or more prospect calls on, within twelve months prior to termination of her employment. (Instrument No. 74-9 at 2, Section I(C) ). The non-solicitation covenant *679 requires that Moffitt, for eighteen months following her departure from GE, refrain from communicating with GE customers or prospective customers "regarding products or services that are similar to or competitive with those I have gained knowledge of while employed by the Company." (Instrument No. 74-9 at 4, Section I(V) ). Moffitt further agreed not to "engage in any subterfuge to circumvent this prohibition," including supervising others in soliciting customers or prospective customers or providing others with confidential information to assist in soliciting customers or prospective customers. (Instrument No. 74-9 at 4, Section I(V) ).
Moffitt's Employment Agreement also contains a section on her duties upon termination or resignation. (Instrument No. 74-9 at 4, Section IV). These duties include returning all confidential information, participating in the exit interview process, and advising GE "in writing of the nature of any new business position I accept during the eighteen (18) months following the termination of my employment with the Company." (Instrument No. 74-9 at 4, Section IV).
On September 19, 2012, Moffitt resigned her position with GE, but she agreed to remain with GE until October 19. (Instrument No. 74-1 at 14; Instrument No. 74-5 at 5). Moffitt's supervisor asked her on September 28 to "let me know where you are going to be working post GE-we have some specific processes we need to go through if you are going to a competitor." (Instrument No. 80-1 at 7). GE's Human Resources Manager Maria Iragorri stated in an affidavit that these procedures include immediately terminating access to GE's data network and ending employment the same day. (Instrument No. 80-1 at 10). On October 4, 2012, Moffitt asked GE if she could resign effective October 17, and GE agreed. (Instrument No. 80-2 at 16; Instrument No. 74-5 at 5).
After resigning her position, Moffitt began to seek out other employment by contacting customers and other companies who had expressed a previous interest in hiring her. (Instrument No. 74-1 at 15). Matthew Corr, the chief operating officer of AmSpec, called her on September 27, 2012, after hearing that she was leaving GE. (Instrument No. 74-1 at 15; Instrument No. 80-1 at 28, 59-60). Corr interviewed her in person soon thereafter. (Instrument No. 74-1 at 15-16; Instrument No. 80-1 at 61). Before the interview, Moffitt prepared a one-page proposed business plan using her GE laptop. (Instrument No. 80-2 at 4, 9). The plan included projected revenue for upcoming years, estimated cost of equipment needs, personnel needs, and targeted fuel treatment types by geographic region. (Instrument No. 80-2 at 4, 9). It also included a list of "needs to accomplish": "Hard Hitting Solid Team; Chemical Supply Gulf Coast; Equipment; Balance of Higher Margin/Lower Margin Business-Product Mix; Strong EHS Safety Culture; Approvals at 'Target' Terminals/Refineries; [and] Minimize Inventory While Executing at Low COGs for Additives." (Instrument No. 80-2 at 4). Corr offered Moffitt a job as Vice President at AmSpec sometime in early October and sent her a formal offer on October 9, which she accepted on October 10 or 11. (Instrument No. 74-4 at 2; Instrument No. 74-1 at 15-16).
Iragorri states that "Moffitt never informed me, nor anyone else at GE as far as I am aware, that she planned to compete with GE in her new position with Amspec," instead representing that her new position would not involve competing with the DFT. (Instrument No. 80-1 at 10). Moffitt met with Iragorri on October 16 for an exit interview. (Instrument *680 No. 80-1 at 19-21). At the bottom of the form, it asks, "Is the employee resigning from GE to work for a competitor?" (Instrument No. 80-1 at 21). The box is checked "No." (Instrument No. 80-1 at 21). Iragorri states that she personally witnessed Moffitt check "No," and that Moffitt also verbally represented "that she was not going to be competing with GE's DFT in her new position at Amspec." (Instrument No. 80-1 at 11). Moffitt testified, however, that she had informed Iragorri the previous week that she would be working at AmSpec. (Instrument No. 74-1 at 16). During the exit interview, Iragorri asked what Moffitt would be doing at AmSpec and Moffitt said, "I'm going to developing ... Additives' product line and going after different additives segments." (Instrument No. 74-1 at 16). Moffitt testified that Iragorri told her, "Well, technically today I don't think that's a competitor," and Iragorri did not believe that AmSpec would be considered a competitor. (Instrument No. 74-1 at 16).
AmSpec had recently decided to enter the fuel treatment business. (Instrument No. 74-3 at 4-5). In addition to Moffitt, AmSpec also hired Scott Hagstrom, who previously worked for another company that performed fuel treatments, as Director of Additive Sales to help run its fuel treatment division. (Instrument No. 74-6 at 4-5). Although Moffitt is Hagstrom's supervisor, Moffitt testified that they "have the same role," with Moffitt focusing more on finance and Hagstrom focusing more on operations. (Instrument No. 74-5 at 4). In addition to Hagstrom and Moffitt, AmSpec hired three employees who had worked with Moffitt at GE: Chris Hessong, Robin Valentis, and David Andrews. Hessong received a written offer to be an Operations Supervisor in the Fuel Additives Division on October 12, 2012, (Instrument No. 80-2 at 30), while Moffitt was still employed by GE.
On October 19, 2012, Moffitt's second day with AmSpec, AmSpec and GE co-hosted a yacht cruise as part of the New York Harbor Show. (Instrument No. 80-4 at 9). GE's corporate representative, Scott Nalven, testified that Moffitt appeared on the yacht as an AmSpec representative with no notice to GE or GE's customers, many of whom she had invited there on GE's behalf. (Instrument No. 80-4 at 14). Nalven testified that he observed Moffitt speak to representatives of two of GE's customers, but he is not aware what they talked about. (Instrument No. 80-4 at 14-15). Moffitt also told GE employee Kevin Kurtz that her shoes were "AmSpec red." (Instrument No. 805 at 43). Following the yacht cruise, AmSpec began performing cargo treatments in November 2012 and continues doing so to this day. See generally (Instrument No. 80).
C.
GE filed suit against AmSpec and Moffitt in this Court on February 21, 2013, alleging that Moffitt violated her post-employment contractual obligations to GE and that AmSpec tortiously interfered with GE's employment contract with Moffitt. (Instrument No. 1 at 9-11). On March 8, 2013, GE filed a motion for preliminary injunction, seeking to enforce the non-solicitation covenant contained in the Agreement between GE and Moffitt and also seeking relief against AmSpec on a theory of tortious interference with contract. (Instrument No. 5 at 1). The Court first heard the motion as a temporary restraining order on March 27, 2013 and denied a TRO. (Minute Entry, 03/27/2013). After expedited discovery, the Court heard the motion for preliminary injunction on June 11, 2013. (Minute Entry, 06/11/2013). At the hearing, the parties announced that they had agreed on an injunction and would submit an agreed order to the Court within a week. (Minute Entry, 06/11/2013). The *681 Court therefore denied the motion for a preliminary injunction without prejudice to reurging. (Minute Entry, 06/11/2013). However, no proposed order was ever submitted, and there is no injunction in place.
On July 22, 2013, GE filed an amended complaint against Moffitt and AmSpec, alleging the following thirteen causes of action: breach of covenant not to compete; illegal use of confidential information; breach of conflicting employment obligations; tortious interference with contract; breach of fiduciary duty; breach of common law duty with regard to confidential information; misappropriation; fraud by non-disclosure; tortious interference with prospective business relationships; unfair competition; civil conspiracy; constructive fraud; and unjust enrichment. (Instrument No. 43). Moffitt filed counterclaims for declaratory judgment and tortious interference with contract against GE on September 17, 2013. (Instrument No. 55). The same day, AmSpec filed counterclaims for business disparagement and for tortious interference with Moffitt's employment contract and AmSpec's customer contracts. (Instrument No. 56).
On February 15, 2014, GE filed three separate motions for summary judgment on Moffitt and AmSpec's counterclaims. (Instrument Nos. 71, 72, 73). That same day, Moffitt and AmSpec filed a motion for summary judgment on GE's claims against them. (Instrument No. 74). Moffitt and AmSpec filed a response to GE's motions for summary judgment on March 10, 2014 (Instrument No. 76), and GE filed a reply on March 24, 2014. (Instrument No. 88). GE filed a response to Moffitt and AmSpec's motion for summary judgment on March 10, 2014 (Instrument No. 80), and Moffitt and AmSpec filed a reply on March 24, 2014. (Instrument No. 86). Moffitt and AmSpec also filed objections to evidence (Instrument No. 87) and a motion to strike (Instrument No. 90) on March 24, 2014, and GE filed responses on April 14, 2014. (Instrument Nos. 97, 99). AmSpec filed a reply in support of its motion to strike on April 21, 2014. (Instrument No. 101). The Court granted the motion to strike on April 22, 2014 (Instrument No. 102). The objections to evidence remain pending. (Instrument No. 87).
II.
Defendants have filed objections to Plaintiff's summary judgment evidence. (Instrument No. 87). Plaintiff has filed a response. (Instrument No. 99).
Defendants first object to Exhibit 10 (Instrument No. 80-1 at 79), which the parties agree is a demonstrative timeline of some of the events occurring in this case. (Instrument No. 87 at 3; Instrument No. 99 at 2). Defendants argue that many of the entries on the timeline are derived from Exhibit No. 7, the DLP Report which the Court previously struck from the record. (Instrument No. 102). To the extent that Exhibit No. 10 references the inadmissible DLP Report, Defendants' objection is SUSTAINED. However, the remainder of the timeline refers to other evidence in the summary judgment record, to which Defendants have not objected. To the extent that Exhibit No. 10 refers to summary judgment evidence beside the DLP Report, Defendants' objection is OVERRULED.
Defendants next object to portions of Exhibit 18 (Instrument No. 80-2 at 29), Kevin Kurtz's deposition transcript, on hearsay grounds. In the deposition excerpt, Kurtz testified that he spoke with Statoil employee John Kaczka in December 2012. (Instrument No. 80-2 at 29). Kurtz testified that Kaczka spoke very highly of Moffitt and he was disappointed she had left GE because "it was going to be a huge gap to fill." (Instrument No. 80-2 at 29). Kurtz testified that he assured *682 Kaczka that GE would continue to operate in the fuel treatment business and urged Statoil "to hang in there." (Instrument No. 80-2 at 29). Kaczka told Kurtz that now that Moffitt had left, Statoil likely had two preferred suppliers and that GE was one of them. (Instrument No. 80-2 at 29). Kaczka also told Kurtz that he had a conversation with Moffitt, but he did not remember "what he said that she said." (Instrument No. 80-2 at 29). Defendants object on the basis of hearsay, claiming that Kurtz's description is "of a second-hand conversation with a customer about Michelle Moffitt." (Instrument No. 87 at 3). It is not clear which portions of the transcript Defendants object to, and Plaintiff notes that Defendants themselves cite to portions of this same excerpt in one of their motions. See (Instrument No. 76 at 10, 17). Additionally, Plaintiff does not cite this testimony for the truth of the matter asserted, but rather to show that the statement was made. See (Plaintiff's Response, Instrument No. 80 at 14 n.71, 31 n.187). It is therefore not hearsay, United States v. Jennings , 527 F.2d 862, 869 (5th Cir. 1976), and Defendants' objections to Exhibit 18 are OVERRULED.
Defendants next object to Exhibit 33-3 and Exhibit 33-4 (Instrument No. 80-4 at 17-18), exhibits to the deposition of Scott Nalven. (Instrument No. 87 at 4). Exhibit 33-3 is a list entitled "Confidential Information," and Exhibit 33-4 is a list entitled "Measures to Protect Trade Secrets." (Instrument No. 80-4 at 17-18). Nalven testified that he prepared the documents himself as notes to help him testify at his deposition that day. (Instrument No. 80-4 at 12). Defendants object to both documents as inadmissible hearsay. (Instrument No. 87 at 4). The Court need not consider or rely upon these exhibits in its determination of the parties' motions for summary judgment because Nalven testified to the information contained in the exhibits. See (Instrument No. 80-4 at 13, 15-16). Therefore, Defendants' objections to Exhibits 33-3 and 33-4 are OVERRULED as moot. Brantley v. Inspectorate Am. Corp. , 821 F.Supp.2d 879, 886 (S.D. Tex. 2011) (Gilmore, J.).
Defendants next object to the March 18, 2013 affidavit of Kevin Kurtz, Exhibit 43. (Instrument No. 80-5 at 3-5; Instrument No. 87 at 4). In this affidavit, Kurtz claims that he reviewed the Employment Agreement signed by Moffitt and, based on that Agreement, composed a list of twenty named companies that were subject to Moffitt's non-solicitation provision. (Instrument No. 80-5 at 3-4). Kurtz has since testified that he never looked at Moffitt's Employment Agreement before signing the affidavit. (Instrument No. 99-1 at 4). Defendants argue that the affidavit is therefore not based on personal knowledge. Plaintiff responds, however, that Kurtz has testified he was familiar with his own identical Employment Agreement, making the affidavit based on his personal knowledge. (Instrument No. 99 at 6). Defendant also objects to Kurtz's list as hearsay to the extent it is derived from what other employees told him about Moffitt's sales activities. (Instrument No. 87 at 5). Plaintiff responds that Kurtz is permitted under Fifth Circuit precedent to have personal knowledge of activities in which he did not actually participate. See Hamilton v. Trover Solutions, Inc. , 104 Fed.Appx. 942, 944 (5th Cir. 2004) (affirming denial of motion to strike where manager of an organization gleaned personal knowledge of organization's practices by participating in those practices or reviewing the organization's records). Therefore, Defendants' objections to Exhibit 43 are OVERRULED.
Lastly, Defendants object to several paragraphs of the March 10, 2014 affidavit of Kurtz. (Instrument No. 80-5 at 42-44; Instrument No. 87 at 5-7). In paragraph four, Kurtz writes, "Many, but by no *683 means all, of the sales reflected in Amspec's financial statement are to customers that GE sold cargo treatments to within the twelve months prior to the departure of [Moffitt] from GE." (Instrument No. 80-5 at 42). In paragraph five, Kurtz writes that "Amspec's financial statement indicates that it sold cargo treatments to GE's customers largely in the same general locations that GE did in the twelve months prior to" Moffitt's departure. (Instrument No. 80-5 at 43). Defendants object that these paragraphs are hearsay because the financial statement itself, which is part of the summary judgment record (Instrument No. 81), is the best evidence of Kurtz's claim. (Instrument No. 87 at 5). However, Kurtz is permitted to provide his rational perception of the facts underlying this action, Fed. R. Evid. 701(a), and Defendants do not argue that paragraph four is inaccurate. Therefore, Defendants' objections to these portions of paragraphs four and five of Exhibit 50 are OVERRULED.
Defendants also argue that an additional portion of paragraph five, as well as the entirety of paragraphs six and seven, of the March 10, 2014 Kurtz affidavit are based on speculation and lack foundation. In paragraph five, Kurtz writes, "I believe that most of all of those [cargo treatment] nominations were awarded to Amspec by the same individuals that award nominations to GE," based on his knowledge of the customers he has worked with. (Instrument No. 80-5 at 43). In paragraph six, Kurtz writes that, based on his knowledge of GE's business, his review of Amspec's financial statement and business plan, and awareness of the information that Moffitt had access to at GE, he believes that "Amspec has used confidential information about GE's DFT...." (Instrument No. 80-5 at 43). In paragraph seven, Kurtz writes, "In the absence of the use of GE's confidential information by Amspec, I believe that GE would likely have been awarded at least many of the nominations that have been awarded to Amspec by GE customers...." (Instrument No. 80-5 at 43). Defendants object that this testimony lacks foundation and is inadmissible speculation. (Instrument No. 87 at 6). Plaintiff responds that Kurtz's testimony is "clearly based on the knowledge and experience he gained as GE's Sales Director." (Instrument No. 99 at 8). However, Kurtz's statements are completely lacking any factual basis for his beliefs that AmSpec won nominations from the same individuals as GE does, AmSpec used confidential information or that, in the absence of such use, GE could have won more nominations. His position as Sales Director does not entitle him to make unsupported or unexplained conclusions. See Grimes v. Tex. Dep't of Mental Health & Mental Retardation , 102 F.3d 137, 139 (5th Cir. 1996) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence."). Therefore, Defendant's objections to this portion of paragraph five and to the entirety of paragraphs six and seven are SUSTAINED.
Accordingly, Defendants' objections to Plaintiff's summary judgment evidence are OVERRULED in part and SUSTAINED in part. (Instrument No. 87).
III.
Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ; Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Warfield v. Byron, 436 F.3d 551, 557 (5th Cir. 2006).
The "movant bears the burden of identifying those portions of the record it believes *684 demonstrate the absence of a genuine issue of material fact." Triple Tee Golf, Inc. v. Nike, Inc. , 485 F.3d 253, 261 (5th Cir. 2007) (citing Celotex Corp. v. Catrett , 477 U.S. 317, 322-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." Sossamon v. Lone Star State of Tex. , 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex , 477 U.S. at 325, 106 S.Ct. 2548. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Boudreaux v. Swift Transp. Co. , 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." United States v. $92,203.00 in U.S. Currency , 537 F.3d 504, 507 (5th Cir. 2008) (quoting Little v. Liquid Air Corp. , 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ).
After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." Thomas v. Price , 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. Little , 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," Ragas v. Tennessee Gas Pipeline Co. , 136 F.3d 455, 458 (5th Cir. 1998) ; Baranowski v. Hart , 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, Connors v. Graves , 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Boudreaux , 402 F.3d at 540 (quoting Little , 37 F.3d at 1075 ). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." Clark v. Am's Favorite Chicken , 110 F.3d 295, 297 (5th Cir. 1997).
In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. E.E.O.C. v. Chevron Phillips Chemical Co., LP , 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." Jackson v. Cal-Western Packaging Corp. , 602 F.3d 374, 379-80 (5th Cir. 2010) ; Malacara v. Garber , 353 F.3d 393, 405 (5th Cir. 2003) ; Ragas, 136 F.3d at 458 ; Nissho-Iwai American Corp. v. Kline , 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, *685 that evidence is not properly before the district court." Malacara , 353 F.3d at 405.
IV.
AmSpec and Moffitt move for summary judgment on all thirteen of GE's claims against them.
A.
Defendants first move for summary judgment on Plaintiff's claim that Moffitt breached the non-solicitation covenant contained in her Employment Agreement. Defendants argue that Moffitt's Employment Agreement is unenforceable because the non-solicitation covenant does not contain a reasonable geographic limitation and imposes a greater time restriction than necessary. Defendants further argue that, even if the Agreement is enforceable, there is no evidence that Moffitt has violated her agreement.
A non-solicitation covenant is "enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made" and contains reasonable "limitations as to time, geographical area, and scope of activity to be restrained" that "do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a) (discussing criteria for enforceability of covenants not to compete); see also Rimkus Consulting Grp., Inc. v. Cammarata , 255 F.R.D. 417, 438-39 (S.D. Tex. 2008) (holding that a "nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable" (citations omitted) ). The enforceability of a non-solicitation covenant is a question of law for the court. Safeworks, LLC v. Max Access, Inc. , CIV.A. H-08-2860, 2009 WL 959969, *3 (S.D. Tex. Apr. 8, 2009).
Defendants argue that the non-solicitation covenant does not contain a reasonable geographic limitation because it does not, in fact, contain any geographic limitation. (Instrument No. 74 at 10-11). Plaintiff responds that the non-solicitation covenant contains a reasonable alternative to a geographic limitation by limiting its restriction to customers or prospective customers with whom Moffitt worked during her last eighteen months at GE. (Instrument No. 18 at 16; see Instrument No. 74-9 at 2, Section I(B)-(C) ).
"A reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer." TransPerfect Translations, Inc. v. Leslie , 594 F.Supp.2d 742, 754 (S.D. Tex. 2009). In the absence of an explicit geographic scope, "[a] number of courts have held that a non-compete covenant that is limited to the employee's clients is a reasonable alternative to a geographical limit." Gallagher Healthcare Ins. Servs. v. Vogelsang , 312 S.W.3d 640, 654 (Tex. App.-Houston [1st Dist.] 2009, pet. denied) (collecting cases). Therefore, territorial restrictions may be expressed "not in geographic terms, but by describing a limited number of" clients, customers, or patients. See W.R. Grace & Co., Dearborn Div. v. Mouyal , 262 Ga. 464, 467, 422 S.E.2d 529, 533 (1992) ; Curtis v. Ziff Energy Grp., Ltd. , 12 S.W.3d 114, 119 (Tex. App.-Houston [14th Dist.] 1999, no pet.) (permitting nationwide geographic clause where plaintiff limited its competitors to twenty companies, which did not include the entire possible field of companies).
Plaintiff provides an affidavit from Kevin Kurtz, its Sales Director, which declares that Moffitt would only be restricted from contacting twenty "customers" or "prospective customers," as those words are defined in the non-solicitation agreement. (Instrument No. 80-5 at 4). Plaintiff *686 argued at the TRO hearing that this list provided an implied, "tight" geographic limitation. (Instrument No. 41 at 22-23; TRO Transcript). The Court first notes that Kurtz has since testified that he had never looked at Moffitt's employment contract before signing the affidavit that purportedly interpreted the scope of the contract, assuming only that it was "similar" to his own contract. (Instrument No. 99-1 at 4). Furthermore, Kurtz testified that he created that list of twenty customers or prospective customers in part by going to other employees on his team and telling them he "needed a list of customers that we wanted to add to the list for the lawyers to protect." (Instrument No. 87-2 at 6). Specifically, he asked these other employees "about their customers, since ... they had a better handle on the customers that we wanted to evaluate as potential customers ... that we should put down as critical customers to protect." (Instrument No. 86-1 at 5). Therefore, Kurtz's affidavit statement that these twenty companies were in fact customers contacted by Moffitt during her last eighteen months at GE, as required by her employment contract, is not competent evidence. Courts, as cited by Plaintiff, have upheld restrictive covenants without geographic restrictions when the plaintiff provides a precise list of customers covered under the agreement. See Gallagher , 312 S.W.3d at 654-55 (finding agreement enforceable because its terms only precluded former employee from working with the 80 clients with whom she formerly dealt); Investors Diversified Servs., Inc. v. McElroy , 645 S.W.2d 338, 339 (Tex. App.-Corpus Christi 1982, no writ) (finding agreement enforceable because "restriction was limited to 150 current customers of the appellant, with whom the appellee had contacted or dealt with"); Stocks v. Banner Am. Corp. , 599 S.W.2d 665, 666 (Tex. App.-Texarkana 1980, no writ) (remanding for trial court to reform the order so that customer list included only customers of the former employee). Similarly, the court in Wright v. Sport Supply Group found that the agreement was overly broad because it was not limited to customers with whom the plaintiff had dealings and, before reforming the agreement, required that the employer affirmatively establish who the former customers were. Wright v. Sport Supply Grp., Inc. , 137 S.W.3d 289, 298-99 (Tex. App.-Beaumont 2004, no pet.). No such competent evidence of Moffitt's "customers" or "prospective customers" exists here, such that GE can meet its burden of showing that the alternative to geographic limitation is reasonable.
Furthermore, even assuming that Kurtz's list of twenty companies is competent evidence of Moffitt's actual "customers" and "prospective customers" under the Agreement, the restrictive covenant is nevertheless unreasonable. Moffitt argues that the Agreement and Kurtz's affidavit restrict her from soliciting twenty global companies, without regard to which individuals Moffitt actually worked with at those companies. (Instrument No. 74 at 12). These twenty companies include Valero, various Shell entities, Exxon Mobile, Statoil, Morgan Stanley, JP Morgan, and Chevron, among others. (Instrument No. 74-11 at 3). Most of these companies operate multiple refinery locations throughout North America, which each makes independent decisions regarding cargo treatment nominations. (Instrument No. 74-28 at 2). Therefore, Moffitt's former customer contact at one customer's refinery likely has no impact on her ability to win a cargo treatment nomination from another refinery location owned by the same company, (Instrument No. 74-28 at 2), making it unreasonable to restrict her from soliciting other refineries within the same company.
Despite this, GE's agreement attempts to restrict Moffitt from soliciting the entire *687 corporate entity. See (Instrument No. 74-11 at 3; Instrument No. 74-9 at 2, Section I(B)-(C) ). GE does not argue that its definition of "customer" is reasonable, instead arguing that this issue is a "red herring" because its evidence shows that AmSpec sold cargo treatments to GE's customers "largely in the same general locations that GE did in the twelve months prior to" Moffitt's department from GE. (Instrument No. 80 at 17 n.81; Instrument No. 80-5 at 43). Kurtz "believe[s] that most or all of those nominations were awarded to Amspec by the same individuals that award nominations to GE." (Instrument No. 80-5 at 43). Assuming Kurtz's belief is accurate, GE does not explain how this evidence is relevant to its overly broad definition of "customer" in the Agreement. Presumably, GE is arguing that the definition in the Agreement is immaterial because it will not be attempting to prove that Moffitt solicited clients outside the markets she solicited for GE. See (Instrument No. 80 at 17 n.81). However, this argument relates to whether Moffitt violated the Agreement, not whether the Agreement is overly restrictive. This is particularly true here, where GE and GE employees have argued over the course of this litigation that the definition of "customer" extends to entire corporate entities, and therefore has been attempting to restrict Moffitt from soliciting entire corporate entities. See (Instrument No. 74-11 at 3; Instrument No. 74-9 at 2, Section I(B)-(C); Instrument No. 76-2 at 4; Instrument No. 76-3 at 7-8).
Because "[a] restrictive covenant is unreasonable unless it bears some relation to the activities of the employee," Wright , 137 S.W.3d at 298, the Court finds that the expansive definitions of "customer" and "prospective customer" contained in Moffitt's Employment Agreement are unreasonable. GE asks the Court to replace a geographic restriction with a customer-based restriction, but its definitions of "customer" and "prospective customer" extend significantly past individuals or divisions within corporations to the entire corporations themselves. Such a broad definition of "customer" and "prospective customer" is not limited to "the area where the employee had worked for his former employer," AMF Tuboscope v. McBryde , 618 S.W.2d 105, 108 (Tex. Civ.-Corpus Christi 1981, no writ), as required for the geographic covenant or its equivalent to be enforceable. Therefore, the non-solicitation covenant contained in Moffitt's Employment Agreement is unenforceable as written.
Once a restrictive covenant has been held to be unreasonable, courts generally must reform the covenant to make it valid. John R. Ray & Sons, Inc. v. Stroman , 923 S.W.2d 80, 85 (Tex. App.-Houston [14th Dist.] 1996, writ denied) ; see also Tex. Bus. & Com. Code § 15.51(c). Where reformation is necessary, money damages are unavailable and the plaintiff may only obtain injunctive relief. Sadler Clinic Ass'n, P.A. v. Hart , 403 S.W.3d 891, 899 (Tex. App.-Beaumont 2013, pet. denied). However, where the covenant's terms have already expired, "any reformation of that provision by the trial court would [be] an exercise in futility." John R. Ray , 923 S.W.2d at 85. Here, Moffitt's Employment Agreement limits the non-solicitation's restrictive terms to eighteen months. (Instrument No. 74-9 at 3-4). The terms of her non-solicitations agreement therefore expired on April 18, 2014, eighteen months after she left GE, and the Court need not reform the non-solicitation agreement.
In an abundance of caution, the Court also addresses Defendants' argument that there is no evidence Moffitt in fact violated her non-solicitation agreement. The definition of solicitation in Moffitt's agreement requires that she not "solicit, call upon, communicate, attempt to *688 communicate, or assist another in doing so, with any Customer or Prospective Customer regarding products or services that are similar to or competitive with those I have gained knowledge of while employed by the Company." (Instrument No. 74-9 at 4, Section I(V) ). Moffitt also may not
engage in any subterfuge to circumvent this prohibition, including accompanying others on calls to Customers or Prospective Customers, contacting Customers or Prospective Customers with other persons, supervising other persons in soliciting Customers or Prospective Customers, providing Confidential Information to others to assist them in soliciting or serving Customers or Prospective Customers, participating in developing presentations to be made to Customers or Prospective Customers, or other similar activities.
(Instrument No. 74-9 at 4, Section I(V) ).
GE claims that Moffitt's appearance at the New York Harbor Show cruise, on her first day with AmSpec, is evidence of her breach. (Instrument No. 80 at 18). AmSpec's Chief Operating Officer, Matthew Corr, testified that the event is a "social" one; "It's more of a bring your spouse or significant other and enjoy a night out with us." (Instrument No. 80-1 at 70). He also acknowledged that the purpose of the event was business development. (Instrument No. 80-1 at 70). However, the only evidence GE presents that Moffitt was soliciting customers is that she spoke with at least two GE customers during the cruise and that Moffitt told Kurtz that her bright red shoes were "AmSpec red." (Instrument No. 80 at 18; Instrument No. 80-4 at 14-15; Instrument No. 80-5 at 43). Although GE's corporate representative testified that Moffitt was restricted from speaking to GE's customers for eighteen months, (Instrument No. 80-4 at 15), Moffitt's Employment Agreement does not reflect that limitation. Speaking to GE's customers is not a solicitation as defined by the Employment Agreement, which restricts only conversations about "products or services that are similar to or competitive with" GE's products or services. (Instrument No. 74-9 at 4, Section I(V) ). GE has presented no evidence beyond mere speculation that Moffitt had such a conversation on the Harbor Show cruise.
GE next claims that AmSpec's marketing director, Tom Fusco, does not conduct marketing activities for AmSpec's additives division. (Instrument No. 80 at 18). Because the additives business is "too technical of a business for [Fusco's] marketers to understand how to market," the marketing department's job was simply to inform potential clients that AmSpec could now perform that service. (Instrument No. 80-5 at 10). Although GE does not discuss the relevance of this testimony, the Court presumes that GE is claiming that Moffitt must be soliciting customers if AmSpec's marketing division is not doing so. However, that inference is not merited based on Fusco's testimony. Moffitt's Employment Agreement does not prevent her from supervising employees who are soliciting GE's customers, it only prevents her from "supervising other persons in soliciting Customers or Prospective Customers." (Instrument No. 74-9 at 4, Section I(V) (emphasis added) ). Without evidence that Moffitt was soliciting GE's customers herself or supervising her AmSpec employees in the actual solicitation of customers, Fusco's testimony is no evidence of Moffitt's breach.
Finally, GE claims that Moffitt's interactions with Scott Hagstrom provide evidence of Moffitt's breach. (Instrument No. 80 at 19). Specifically, GE cites to Hagstrom's testimony that when AmSpec employees call him with an additives lead, if soliciting that potential client would violate Hagstrom's agreement with his former employer, Hagstrom refers the lead to *689 Moffitt. (Instrument No. 80-4 at 24). Hagstrom testified that Moffitt similarly refers potential clients to Hagstrom when her contact with the client might violate her agreement with GE. (Instrument No. 80-4 at 24). GE claims that this testimony reflects Hagstrom's acknowledgement "that he and Moffitt call on each other's customers," (Instrument No. 80 at 19), but Hagstrom's testimony reveals a clear attempt to comply with Moffitt's agreement, not evidence of a potential breach. Although Moffitt may breach her agreement through "subterfuge," which includes "accompanying others on calls ..., contacting Customers ... with other persons, supervising other persons in soliciting Customers ..., [or] providing Confidential Information to others to assist them in soliciting or serving Customers or Prospective Customers," Hagstrom only testified that he and Moffitt both refused to work with clients if doing so might violate their respective agreements. (Instrument No. 74-9 at 4, Section I(V) ). His testimony is not evidence that Moffitt utilized any "subterfuge" in referring her former GE clients to Hagstrom. Again, supervising an employee who solicits Moffitt's former customers, alone, does not violate Employment Agreement. See (Instrument No. 74-9 at 4, Section I(V) ). Therefore, the Court finds that Hagstrom's testimony is not evidence that Moffitt has breached her Employment Agreement.
Similarly, Hagstrom's e-mail to Moffitt informing her that he would be in San Antonio that week to meet Valero is not evidence that Moffitt engaged in subterfuge. (Instrument No. 80-5 at 37-41). The e-mail also contains a chain of e-mails between Hagstrom and Valero representatives scheduling that meeting in San Antonio and discussing AmSpec's bid. (Instrument No. 80-5 at 37-41). GE describes this e-mail as evidence that "Hagstrom keeps Moffitt apprised of his efforts with her customers," which GE claims is a violation of Moffitt's agreement because Moffitt is Hagstrom's supervisor. However, as discussed above, the Employment Agreement only restricts Moffitt from supervising Hagstrom in solicitations , not supervising any employee who does solicitation work. It is reasonable for Moffitt to know that Hagstrom would be out of town that week, and the e-mail does not provide evidence that Moffitt was supervising Hagstrom in conducting the solicitation or providing him confidential information. Because GE has not offered any evidence that Moffitt violated her non-solicitation covenant, summary judgment is appropriate.
Accordingly, Defendants' motion for summary judgment on Plaintiff's claim that Moffitt breached her non-solicitation covenant is GRANTED.
B.
Defendants next move for summary judgment on Plaintiff's claim that both Defendants misappropriated trade secrets.
"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." Computer Assocs. Int'l, Inc. v. Altai, Inc. , 918 S.W.2d 453, 455 (Tex. 1996) (quoting from the Restatement of Torts § 757 (1939) ). "It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business.... A trade secret is a process or device for continuous use in the operation of the business." CQ, Inc. v. TXU Min. Co., L.P. , 565 F.3d 268, 273 (5th Cir. 2009) (quoting Restatement of Torts § 757, cmt. b). To prevail on a misappropriation claim under Texas law, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a *690 breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." CQ, Inc. , 565 F.3d at 273 (quoting Gaia Techs. Inc. v. Recycled Prods. Corp. , 175 F.3d 365, 376 (5th Cir. 1999) ). "[A] former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer." Trilogy Software, Inc. v. Callidus Software, Inc. , 143 S.W.3d 452, 467 (Tex. App.-Austin 2004).
Defendants concede that a reasonable jury could find that GE's product cost, pricing information, and sales data are trade secrets. (Instrument No. 74 at 18 n.14). Defendants argue, however, that there is no admissible evidence that they used this information. (Instrument No. 74 at 21). Plaintiff argues that Moffitt took customer lists, target customer lists, cost reduction case studies, proposal documents, financial information, and customer treatment information. (Instrument No. 80 at 24). However, Plaintiff's evidence of this is limited to the Data Loss Prevention Report, (Instrument No. 96), which the Court has previously held to be inadmissible. (Instrument No. 102). Therefore, Plaintiff cannot establish that "the trade secret was acquired through a breach of a confidential relationship or discovered by improper means." See CQ, Inc. , 565 F.3d at 273. Furthermore, to the extent that Plaintiff is arguing AmSpec has used its trade secrets by undercutting it on price, Plaintiff cites only to Moffitt's business plan she prepared for her AmSpec interview. (Instrument No. 80-2 at 9). Although Plaintiff claims that the business plan reveals Moffitt made projections of profit margins based on her knowledge of GE's trade secrets, the plan itself contains no such specific information. See (Instrument No. 80-2 at 9). Indeed, the plan makes clear that Moffitt's revenue estimates were extremely general, measured only in millions of dollars: one million the first year, ten million the second year, and twenty million the fourth year. (Instrument No. 80-2 at 9). The business plan is therefore insufficient to show that Moffitt used GE's trade secrets to undercut GE on price. Summary judgment is appropriate where Plaintiff only shows that Defendants "inevitably" or likely misappropriated trade secrets. Trilogy Software, Inc. v. Callidus Software, Inc. , 143 S.W.3d 452, 464 (Tex. App.-Austin 2004, no pet.). Therefore, Defendants are entitled to summary judgment on Plaintiff's allegation that they misappropriated GE's financial and customer-related trade secrets. (Instrument No. 80 at 24).
Plaintiff also argues that its treatment trailers are a trade secret entitled to protection. (Instrument No. 80 at 25). Defendants deny that the trailers contain proprietary information. (Instrument No. 74 at 18-19). The only admissible evidence Plaintiff has cited regarding the contents of the trailers is the "ACTNOW Trailer Manual," which has a picture of a trailer that could be hitched to a truck on its cover. (Instrument No. 80 at 25 & n.145; Instrument No. 80-5 at 15-30). Plaintiff claims that "the designs and specifications for GE's trailers were proprietary and improved over time," but Plaintiff does not identify any particular designs or specifications the Trailer Manual describes. (Instrument No. 80 at 25). For example, the Trailer Manual instructs employees to have personal protective equipment on hand at all times, and mandates that trailers have first aid kids and spill kits. (Instrument No. 80-5 at 18). Employees must check the trailer to ensure that lights, tire, and safety chains, doors, and brakes all work properly. (Instrument No. 80-5 at 19). Trailers carry a generator, pumps, a toolbox containing at least three wrenches, power cords, and a holding tank. (Instrument *691 No. 80-5 at 19-20). The Trailer Manual contains a step-by-step operational set-up list, including contacting the plant operator, placing the trailer in the appropriate location, setting out traffic cones, placing the "pump as needed," obtaining permission from the operator to open the main injection valve, checking for leaks, and "begin[ning] treating process." (Instrument No. 80-5 at 22). The only specifics in the step-by-step list appear to be an instruction to let the pump run for approximately five seconds and flushing at least 20 gallons of distillate through the hoses for cleaning purposes. (Instrument No. 80-5 at 23). The Trailer Manual also includes rules on communication for the DFT team, including rarely using the reply-all e-mail button, checking spelling and grammar, and communicating sufficient details between team members. (Instrument No. 80-5 at 24-30). Based on this evidence, the Court finds that the Trailer Manual is not a trade secret. See, e.g. , Phillips v. Frey , 20 F.3d 623, 628 (5th Cir. 1994) ("The trade secret must possess at least that modicum of originality which will separate it from everyday knowledge.") (citing references omitted); Metallurgical Indus. Inc. v. Fourtek, Inc. , 790 F.2d 1195, 1199 (5th Cir. 1986) ("[M]atters of general knowledge in an industry cannot be appropriated by one as his secret.") (citing references omitted). Plaintiff does not identify any part of the Trailer Manual that extends beyond everyday knowledge, such as carrying a first-aid kit and setting out traffic cones, or matters of general industry knowledge. The Trailer Manual does not contain any specific information about the implementation of GE's ideas, methodologies, or techniques so as to potentially qualify for trade secret protection. See Metallurgical Indus. Inc. , 790 F.2d at 1199. Therefore, Defendants are entitled to summary judgment on Plaintiff's allegations of misappropriation related to the treatment trailers.
Finally, Plaintiff argues in a footnote that "Moffitt was privy to the formulations and internal COGs of the chemicals manufactured by GE and used by its DFT, namely H2S scavengers." (Instrument No. 80 at 25 n.143). Assuming this information was a trade secret, Plaintiff does not argue that Moffitt or AmSpec used the trade secret. Therefore, Defendants are entitled to summary judgment on Plaintiff's allegation that they misappropriated information about Plaintiff's chemical usage.
Accordingly, Defendants' motion for summary judgment on Plaintiff's misappropriation of trade secrets claim is GRANTED.
C.
Defendants next move for summary judgment on Plaintiff's claim that Moffitt breached her fiduciary duty to Plaintiff. (Instrument No. 74 at 21).[2] Defendants also move for summary judgment on Plaintiff's claim that Moffitt breached conflicting employment obligations. (Instrument No. 74 at 16-17 n.11).
When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with her agency. Johnson v. Brewer & Pritchard, P.C. , 73 S.W.3d 193, 200 (Tex. 2002). Under Texas *692 law, the elements of a breach of fiduciary duty claim are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. Navigant Consulting, Inc. v. Wilkinson , 508 F.3d 277, 283 (5th Cir. 2007). Moffitt does not argue that a fiduciary relationship did not exist between her and GE, but she does claim she did not breach her duty.
Plaintiff identifies numerous activities that it claims show Moffitt breached her fiduciary duty: arranging for suppliers for AmSpec; setting up additives treatments for AmSpec; lying to GE about her new job and her intent to compete with GE; and employing key GE employees, all while still employed by GE. (Instrument No. 80 at 29). Plaintiff's only evidence that Moffitt arranged for supplies while still employed by GE is an e-mail chain beginning on October 16, 2012, Moffitt's last day at GE. (Instrument No. 80-2 at 20-22). On October 16, an employee of Innospec Fuel Specialties sent Moffitt an e-mail with the subject line "New Customer Form" and no information in the e-mail body. (Instrument No. 80-2 at 21-22). Moffitt did not respond until October 21, several days after she left GE. (Instrument No. 80-2 at 22). Because Moffitt did not participate in the e-mail chain until after she departed GE, this evidence is only sufficient to show that Moffitt was preparing to compete, which she may lawfully do. Abetter Trucking Co. v. Arizpe , 113 S.W.3d 503, 510 (Tex. App.-Houston [1st Dist.] 2003, no pet.) ("A fiduciary relationship, however, does not preclude the fiduciary from making preparations for a future competing business venture."); Alliantgroup, L.P. v. Feingold , 803 F.Supp.2d 610, 627 (S.D. Tex. 2011) ("An employee may prepare to go into competition with his employer before resigning without breaching fiduciary duties owed to that employer."). Therefore, Plaintiff cannot show that Moffitt breached her fiduciary duties by arranging AmSpec supplies while still employed by GE.
Second, Plaintiff claims that Moffitt set up meetings on behalf of AmSpec, for GE customers, while still employed by GE. (Instrument No. 80 at 29). In support, GE cites an October 9, 2012 e-mail in which AmSpec employees attempted to set up a dinner with a Statoil employee. (Instrument No. 80-2 at 23-34). The Statoil employee informed GE that "Michelle Moffitt asked me to dinner for 10/17 a couple of weeks ago, so I assumed you were joining her." (Instrument No. 80-2 at 24). However, the Statoil employee made clear that Moffitt had invited her to "dinner with GE ," not AmSpec, for that night, and GE was able to hold the scheduled dinner with Statoil in the absence of Moffitt. (Instrument No. 80-2 at 23-24) (emphasis added). At most, the e-mail suggests that Moffitt scheduled the Statoil dinner for GE's marketing purposes before she left GE and did not inform the other members of her team. It is not evidence that Moffitt breached her fiduciary duty by setting up meetings for competitors on behalf of AmSpec. Therefore, Plaintiff cannot show that Moffitt breached her fiduciary duties by contacting GE customers on AmSpec's behalf while still employed by GE.
Third, Plaintiff claims that Moffitt breached her fiduciary duty by misrepresenting her new job and her intent to compete with GE. (Instrument No. 80 at 29). An employee has a duty to deal openly with her employer and to fully disclose to the employer information about matters affecting the company's business. Bray v. Squires , 702 S.W.2d 266, 270 (Tex. App.-Houston [1st Dist.] 1985, no writ). Moffitt's supervisor asked Moffitt on September 28, 2012 to "let me know where you are going to be working post GE-we *693 have some specific processes we need to go through if you are going to a competitor." (Instrument No. 80-1 at 7). However, Moffitt did not respond. See (Instrument No. 80-1 at 7). Iragorri, GE's HR representative, states that "Moffitt never informed me, nor anyone else at GE as far as I am aware, that she planned to compete with GE in her new position with Amspec," instead representing that Moffitt's new position would not involve competing with the DFT. (Instrument No. 80-1 at 10). Additionally, at the bottom of Moffitt's exit form, it asks, "Is the employee resigning from GE to work for a competitor?" (Instrument No. 80-1 at 21). The box is checked "No." (Instrument No. 80-1 at 21). Iragorri states that she personally witnessed Moffitt check "No," and that Moffitt also verbally represented "that she was not going to be competing with GE's DFT in her new position at Amspec." (Instrument No. 80-1 at 11). Iragorri also received an e-mail from Moffitt in November, after Moffitt had left GE, denying that Moffitt was "in a direct position to conduct fuels business." (Instrument No. 80-1 at 22). Moffitt testified, however, that she had informed Iragorri the previous week that she would be working at AmSpec. (Instrument No. 74-1 at 16). During the exit interview, Moffitt testified that Iragorri asked what Moffitt would be doing at AmSpec and Moffitt said, "I'm going to be developing ... Additives' product line and going after different additives segments." (Instrument No. 74-1 at 16). Moffitt testified that Iragorri told her, "Well, technically today I don't think that's a competitor," and Iragorri did not believe that AmSpec would be considered a competitor. (Instrument No. 74-1 at 16). Assuming, as the Court must at this stage, that GE's version of events is accurate, a reasonable jury could find that Moffitt withheld required information about her upcoming position with AmSpec and did not inform GE about her intent to compete with GE. An issue of material fact therefore precludes summary judgment on GE's claim that Moffitt withheld information about post-employment plans.
Finally, Plaintiff alleges that Moffitt breached her fiduciary duty by hiring Christopher Hessong to work at AmSpec prior to her separation from GE. (Instrument No. 29 at 35). An employee may not solicit the departure of other employees while still working for her employer. Abetter , 113 S.W.3d at 512. However, Hessong testified that he was dissatisfied with GE and began looking for new employment in the summer of 2012. (Instrument No. 74-25 at 3). He spoke to Moffitt on the phone in September 2012, but the conversation did not involve AmSpec, only that Hessong was unhappy at GE and looking for other opportunities. (Instrument No. 74-25 at 3). Moffitt told him, "You'll be fine at GE. What happens to me has nothing to do with your job." (Instrument No. 74-25 at 4). He was contacted by an AmSpec employee in October 2012 about a possible position. (Instrument No. 74-25 at 3). He spoke with Moffitt on the phone twice more before Moffitt left GE. (Instrument No. 74-25 at 4-5). Hessong does not remember what they discussed, but he believes that he asked her for a reference and asked her to put in a good word for him at AmSpec. (Instrument No. 74-25 at 5). Hessong testified that Moffitt did not tell him anything about AmSpec beyond the fact the she was going there. (Instrument No. 74-25 at 5). Nothing in Hessong's deposition testimony introduces a fact issue regarding whether Moffitt solicited his departure from GE in breach of her fiduciary duty to GE. See Abetter , 113 S.W.3d at 512. GE also cites to only the e-mail subject line of an e-mail from Hessong to Moffitt, titled "Operations Lead." (Instrument No. 80 at 11). GE argues that there was no position of Operations Lead *694 at GE, and notes that three days later Hessong was offered the position of "Operations Supervisor" at AmSpec. (Instrument No. 80 at 11). However, Defendants have produced the body of the e-mail in question, which is copied to multiple employees at GE, and states, "Please remove me from the Ops Lead position. I will go back to full time FSR. I can not deal with the lack of communication. I gave it my all, but I can not do it anymore." (Instrument No. 86-4 at 2). The e-mail is signed with Hessong's GE title, "FSR/Operations Lead." (Instrument No. 86-4 at 2). Therefore, the Operations Lead e-mail is not evidence that Moffitt solicited Hessong's departure while still employed by GE. Plaintiff cannot show that Moffitt breached her fiduciary duty by recruiting GE employees prior to her own departure.
Plaintiff's common law claim for breach of conflicting employment obligations mirrors its breach of fiduciary duty claim. See (Instrument No. 80 at 21-22). Plaintiff claims that Moffitt competed with GE and hired GE employees for AmSpec while still employed by GE. However, for the same reasons that summary judgment is appropriate on these portions of Plaintiff's breach of fiduciary duty claim, summary judgment is also appropriate on Plaintiff's common law claim. Plaintiff also claims that Moffitt failed to advise GE that she would be competing with GE after her employment ended, in violation of her Employment Agreement. For the same reason that summary judgment is not available on this portion of Plaintiff's breach of fiduciary duty claim, summary judgment is also not available on Plaintiff's common law claim relating to Moffitt's post-GE employment plans.
Accordingly, Defendants' motion for summary judgment on Moffitt's breach of fiduciary duty and breach of conflicting employment obligation claims are GRANTED in part and DENIED in part. The only breach of fiduciary duty and breach of conflicting employment obligation claims remaining for trial are whether Moffitt concealed her post-GE employment intentions from GE.
D.
Defendants next move for summary judgment on Plaintiff's claims that Moffitt and AmSpec committed fraud by non-disclosure and constructive fraud.
Fraud by nondisclosure is a subcategory of fraud. Schlumberger Tech. Corp. v. Swanson , 959 S.W.2d 171, 181 (Tex. 1997). To establish fraud by nondisclosure, a plaintiff must prove (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC , 324 S.W.3d 840, 850 (Tex. App.-Houston [14th Dist.] 2010, no pet.).
Plaintiff's fraud by nondisclosure claim against Moffitt relates to her alleged failure to inform GE about her post-employment plans. Defendants argue that Plaintiff's claim against Moffitt fails because she had no duty to disclose to GE her plans to join AmSpec. (Instrument No. 74 at 24). In support, Defendants cite Abetter Trucking Co. v. Arizpe , which holds that an at-will employee has no general duty to disclose her post-employment plans to her current employer.
*695 Abetter , 113 S.W.3d at 510. However, as Plaintiff argues, a duty to disclose can arise by a fiduciary relationship between the parties, as existed here between Moffitt and GE. See Rimade Ltd. v. Hubbard Enterprises, Inc. , 388 F.3d 138, 143 (5th Cir. 2004). Furthermore, "there is always a duty to correct one's own prior false or misleading statements, such that a speaker making a partial disclosure assumes a duty to tell the whole truth even when the partial disclosure was not legally require." Id. (internal citations and quotations omitted). Although, as discussed in more detail in the discussion regarding breach of fiduciary duty, Moffitt claims that she gave a complete disclosure of her post-employment plans, GE disputes Moffitt's version of events. For the same reasons that summary judgment is inappropriate on GE's breach of fiduciary duty claim that Moffitt concealed her post-GE employment plans, summary judgment is inappropriate on GE's fraud by nondisclosure claims against Moffitt as well.
Plaintiff's fraud by nondisclosure claim against AmSpec relates to its alleged failure to inform GE that Moffitt would attend the Harbor Show yacht cruise as head of its new additives business. Defendants argue that Plaintiff's fraud by nondisclosure claim against AmSpec fails because no fiduciary relationship existed between AmSpec and GE. (Instrument No. 74 at 24). GE responds that, although the parties' general relationship was not a fiduciary one, the jointly-sponsored yacht cruise in 2012 created a duty for AmSpec to disclose to GE that Moffitt would attend the event as head of AmSpec's new additives business. (Instrument No. 80 at 30). A joint venture forms the basis for a formal fiduciary relationship. Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc. , 48 S.W.3d 865, 878 (Tex. App.-Houston [14th Dist.] 2001, pet. den.). To establish the existence of a joint venture, the following elements must be present: (1) a community of interest; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise. Ayco Dev. Corp. v. G.E.T. Serv. Co. , 616 S.W.2d 184, 186 (Tex. 1981) ; Swinehart , 48 S.W.3d at 879. "[A] joint venture must be based on either an express or an implied agreement." Swinehart , 48 S.W.3d at 879. Whether a joint venture exists is a question of law for the court's determination. Austin Transp. Study Policy Advisory Comm. v. Sierra Club , 843 S.W.2d 683, 691 (Tex.App.-Austin 1992, writ denied).
Here, the 2012 harbor cruise at the New York Harbor Show was co-sponsored by AmSpec, GE, and a third company. (Instrument No. 80-4). This may be sufficient to establish a community of interest and a mutual right of control or management of the enterprise. However, GE has not demonstrated that there was any agreement, express or implied, to share in the losses of the harbor cruise. In Swinehart , the court found no agreement to share losses where there was no indication one party anticipated a legal duty to pay the other party's bills to third parties. Swinehart , 48 S.W.3d at 879 ; see also United States v. $47.875.00 in U.S. Currency , 746 F.2d 291, 294 (5th Cir. 1984). Additionally, although the harbor cruise was intended to increase business for the companies, (Instrument No. 80-1 at 70), there is simply no indication that the parties intended to share in the profits from the cruise. That failure is fatal to GE's attempt to show a joint venture. See Swinehart , 48 S.W.3d at 879. Because no joint venture existed between GE and AmSpec, no fiduciary relationship existed between them.
Plaintiff also claims that Moffitt's fraud by nondisclosure should be imputed to AmSpec because Moffitt began to act as *696 AmSpec's agent while still at GE. (Instrument No. 80 at 30). However, the Court has granted summary judgment against GE on its claims that Moffitt hired away GE employees, arranged suppliers for AmSpec, and set up additives treatments for AmSpec while still employed by GE. Therefore, the Court declines to impute any improper conduct to AmSpec on this basis.
Defendants also move for summary judgment on Plaintiff's claims of constructive fraud against Moffitt and AmSpec. "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." Hubbard v. Shankle , 138 S.W.3d 474, 483 (Tex. App.-Fort Worth 2004, pet. denied). The law declares such breach "fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." Archer v. Griffith , 390 S.W.2d 735, 740 (Tex. 1965) (quoted in Schroeder v. Wildenthal , 3:11-CV-0525-B, 2011 WL 6029727 (N.D. Tex. Nov. 30, 2011) aff'd, 515 Fed.Appx. 294 (5th Cir. 2013) ). The Court has held that a fiduciary duty did not exist between AmSpec and GE and that any fraud by Moffitt will not be imputed to AmSpec. Therefore, summary judgment on GE's constructive fraud claim against AmSpec is granted. Conversely, a fiduciary relationship did exist between Moffitt and GE and issues of material fact remain regarding whether Moffitt breached her duty to disclose to GE her post-employment plans. Therefore, summary judgment is not appropriate on GE's constructive fraud claim against Moffitt, limited only to whether she breached her duty to fully disclose her post-employment plans.
Accordingly, Defendants' motion for summary judgment on Plaintiff's claims for fraud by non-disclosure and constructive fraud are GRANTED in part and DENIED in part. Summary judgment on these claims is GRANTED for AmSpec and DENIED for Moffitt.
E.
Defendants next move for summary judgment on Plaintiff's claims that AmSpec and Moffitt tortuously interfered with GE's prospective business relationships.
To establish a cause of action for tortious interference with prospective business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. Richardson-Eagle, Inc. v. William M. Mercer, Inc. , 213 S.W.3d 469, 475 (Tex. App.-Houston [1st Dist.] 2006, pet. denied). "To establish a claim for tortious interference, a plaintiff must prove that more than mere negotiations occurred." Id. Though it is not necessary to prove that the contract would have certainly been made but for the interference, that result must have been reasonably probable, considering all the facts and circumstances attendant to the transaction. Hill v. Heritage Res., Inc. , 964 S.W.2d 89, 109 (Tex. App.-El Paso 1997, pet. denied).
Plaintiff has identified only one cargo treatment as the basis of its tortious interference with prospective business claim: a November 2012 cargo treatment with Statoil. (Instrument No. 80 at 31). Plaintiff claims that Moffitt spoke with John Kaczka, a Statoil employee, in violation of her Employment Agreement, and that AmSpec then won the cargo treatment *697 from Statoil. (Instrument No. 80 at 31; see also Instrument No. 80-2 at 29; Instrument No. 74-16). However, there is no evidence that Moffitt's conversation with John Kaczka violated her Employment Agreement. The only evidence GE cites regarding Moffitt's alleged conversation is Kevin Kurtz's second-hand deposition testimony that Kaczka told Kurtz that Kaczka had spoken to Moffitt, but Kurtz did not remember "what [Kaczka] said that she said." (Instrument No. 80-2 at 29). This testimony is insufficient to demonstrate that Moffitt solicited Statoil about AmSpec providing cargo treatments, as GE claims. Therefore, Plaintiff cannot establish that Defendants committed any independently tortious or unlawful act that prevented Plaintiff from forming a business relationship with Statoil. See Richardson-Eagle, Inc. , 213 S.W.3d at 475.
Additionally, Kurtz did not testify that GE ever negotiated to obtain the November 2012 cargo treatment that eventually went to AmSpec. Kurtz only testified that he spoke to Kaczka about Moffitt's departure from GE and that he hoped Statoil would "hang in there" in Moffitt's absence. (Instrument No. 80-2 at 29). From this testimony, a reasonable jury could not conclude that there was a reasonable probability that GE would have won that cargo treatment in the absence of Defendants' tortious acts. See Richardson-Eagle, Inc. , 213 S.W.3d at 475 ("To establish a claim for tortious interference, a plaintiff must prove that more than mere negotiations occurred.").
Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for tortious interference with prospective business relationships is GRANTED.
F.
Next, Defendants move for summary judgment on Plaintiff's claims against Moffitt for illegal use of confidential information and breach of a common law duty with regard to confidential information.
Moffitt's Employment Agreement contained various provisions, beyond the non-solicitation provisions, in which she agreed not to disclose GE's confidential information after her employment ended. (Instrument No. 74-9 at 2-5). Defendants claim that there is no evidence that she actually used or disclosed any confidential information, and therefore that Plaintiff cannot demonstrate breach. (Instrument No. 74 at 16 n.11; Instrument No. 74 at 20-21). Plaintiff responds that AmSpec did not know how to start or run an additives business before it hired Moffitt, yet soon after hiring her performed its first cargo treatment and made a profit. (Instrument No. 80 at 20; Instrument No. 81 at 1). However, for the same reasons that the Court granted summary judgment on Plaintiff's misappropriation of trade secrets claim, Plaintiff cannot rely on this mere speculation to establish that Moffitt used GE's confidential information. Again, Plaintiff has not identified any specific information it believes Moffitt used, and Moffitt was entitled to rely on her general knowledge, skills, experience, and education in her new position with AmSpec. See, e.g. , Trilogy Software, Inc. , 143 S.W.3d at 467-68. In the absence of any evidence that Moffitt used confidential information that extended past her general knowledge, skills, experience, and education as a professional skilled in additive treatments, Plaintiff's claims cannot survive summary judgment.
Plaintiff also argues that Moffitt used her knowledge of GE's employees' capabilities and caused AmSpec to hire them. (Instrument No. 80 at 21). Although AmSpec did hire several former GE employees after Moffitt joined GE, Plaintiff does not explain how Moffitt's knowledge of their capabilities was confidential information. Although Moffitt's Employment *698 Agreement includes the "skills and compensation of other employees" in its definition of confidential information, that information must be "non-public." (Instrument No. 74-9 at 2). Plaintiff does not even argue that Moffitt's knowledge of these employees was non-public. See (Instrument No. 80 at 15-16 & n.109). Therefore, Plaintiff's claim regarding former GE employees also cannot survive summary judgment.
Accordingly, Defendants' motion for summary judgment on Plaintiff's claims against Moffitt for illegal use of confidential information and breach of a common law duty with regard to confidential information is GRANTED.
G.
Defendants next move for summary judgment on Plaintiff's claim that AmSpec tortuously interfered with Moffitt's Employment Agreement. GE claims that AmSpec interfered with Moffitt's post-employment obligations under the Employment Agreement with GE. (Instrument No. 80 at 22). AmSpec claims that, because Moffitt did not breach her post-employment obligations to GE, AmSpec must be granted summary judgment on this claim as well.
The elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) that proximately causes damage; and (4) actual damage or loss. Specialties of Mex. Inc. v. Masterfoods USA , 2010 WL 2488031, at *9 (S.D. Tex. June 14, 2010) (citing All Am. Tel., Inc. v. USLD Commc'ns, Inc. , 291 S.W.3d 518, 531 (Tex.App.-Fort Worth 2009, pet. denied) ). However, "covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference and unenforceability of a noncompetition covenant is a valid defense to a claim of tortious interference." Lazer Spot, Inc. v. Hiring Partners, Inc. , 387 S.W.3d 40, 49 (Tex. App. 2012), review denied (Mar. 29, 2013), reh'g overruled (Oct. 30, 2012) (quoting Juliette Fowler Homes, Inc. v. Welch Assocs. , 793 S.W.2d 660, 665 (Tex. 1990) (internal quotations omitted) ). Therefore, because the Court has already held that Moffitt's non-solicitation provision is an unreasonable restraint on trade and therefore unenforceable, AmSpec cannot be liable for any interference with that provision of her Employment Agreement.
Furthermore, the Court has likewise held that Moffitt is entitled to summary judgment on all claims relating to her post-employment obligations, which is the basis of GE's claim against AmSpec. The only issues relating to Moffitt's Employment Agreement remaining for trial involve whether Moffitt complied with her obligation to inform GE, before her employment with GE ended, that she would be competing with GE in her new position. Even if that issue were considered a post-employment obligation, GE does not allege that AmSpec willfully or intentionally interfered with that obligation in Moffitt's Employment Agreement. See (Instrument No. 80 at 22-23). Because GE has not provided any evidence that Moffitt breached her post-employment obligations under her Employment Agreement, GE cannot show that AmSpec interfered with the Agreement and AmSpec is entitled to summary judgment.
Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for tortious interference with contract is GRANTED.
H.
Defendants next move for summary judgment on Plaintiff's claim for unjust enrichment.
*699 "Unjust enrichment is not a distinct independent cause of action, but a theory of recovery." RDG Ltd. P'ship v. Gexa Corp. , 14-04-00679-CV, 2005 WL 949171 (Tex. App.-Houston [14th Dist.] Apr. 26, 2005, no pet.) ; Mowbray v. Avery , 76 S.W.3d 663, 679 (Tex. App.-Corpus Christi 2002, pet. denied). This theory of recovery "characterizes the result of a failure to make restitution of benefits under circumstances which give rise to an implied or quasi-contractual obligation to return the benefits." Amoco Prod. Co. v. Smith , 946 S.W.2d 162, 164 (Tex. App.-El Paso 1997, no writ) (citing City of Corpus Christi v. Heldenfels Bros., Inc. , 802 S.W.2d 35, 40 (Tex. App.-Corpus Christi 1990), affm'd , 832 S.W.2d 39 (Tex. 1992) ). Typically, "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." Heldenfels Bros., Inc. v. City of Corpus Christi , 832 S.W.2d 39, 41 (Tex. 1992).
Because unjust enrichment is not an independent cause of action, Plaintiff may not maintain its unjust enrichment claim as a separate cause of action. However, Plaintiff may rely on unjust enrichment as a theory of recovery for its remaining causes of action that allege Moffitt obtained a benefit by fraud, duress, or the taking of undue advantage. See ids="11945522" index="100" url="https://cite.case.law/sw2d/832/39/">id.
Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for unjust enrichment is GRANTED.
I.
Next, Defendants move for summary judgment on Plaintiff's unfair competition claim. Plaintiff does not respond to this portion of Defendants' motion.
"Unfair competition under Texas law is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." Taylor Pub. Co. v. Jostens, Inc. , 216 F.3d 465, 486 (5th Cir. 2000) (citations and internal quotations omitted). The tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business. Id. ; see also Schoellkopf v. Pledger , 778 S.W.2d 897, 904-05 (Tex. App.-Dallas 1989, writ denied). Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort. Id.
Defendants argue that, to the extent the Court grants summary judgment on the other tort claims in this case, summary judgment on this claim is also appropriate. (Instrument No. 74 at 25 n.31). The Court agrees. See Taylor Pub. Co. , 216 F.3d at 486 ; Schoellkopf , 778 S.W.2d at 904-05. Because the Court has granted summary judgment on all of GE's independent tort claims against AmSpec, AmSpec's motion for summary judgment on GE's claim for unfair competition is appropriate. However, the Court has granted summary judgment on many, but not all, of GE's independent tort claims against Moffitt. Moffitt's motion for summary judgment on GE's claim for unfair competition is therefore GRANTED for all tort claims dismissed by this order and DENIED for the one tort claim remaining for trial alleging that Moffitt failed to inform GE about her post-employment plans.
Accordingly, Defendants' motion for summary judgment on Plaintiff's unfair competition claim is GRANTED in part and DENIED in part.
J.
Finally, Defendants move for summary judgment on Plaintiff's civil conspiracy claim.
*700 The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. Juhl v. Airington , 936 S.W.2d 640, 644 (Tex. 1996). Because the elements of conspiracy require participation in some underlying intentional tort, if no intentional tort was committed, the plaintiff has no claim for conspiracy. Firestone Steel Products Co. v. Barajas , 927 S.W.2d 608, 617 (Tex. 1996).
Plaintiff's only remaining causes of action are against Moffitt and are limited to allegations that she failed to inform GE about her post-employment plans. Defendants argue that Plaintiff cannot establish the third element of a conspiracy claim, a meeting of the minds. (Instrument No. 74 at 26 n.31). Plaintiff responds that AmSpec was aware of Moffitt's contractual restrictions and worked with her to defeat those restrictions. (Instrument No. 80 at 33).
"Civil conspiracy requires a meeting of the minds between two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Transp. Ins. Co. v. Faircloth , 898 S.W.2d 269, 278 (Tex. 1995). "[T]here must be a preconceived plan and unity of design and purpose." Goldstein v. Mortenson , 113 S.W.3d 769, 779 (Tex. App.-Austin 2003) ("A conspiracy to defraud on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the understanding that the other has that purpose."). Assuming that AmSpec was aware that Moffitt was required to inform GE of her post-employment plans, GE has nevertheless introduced no evidence indicating a meeting of the minds as required by law. Instead, the evidence, viewed in the light most favorable to GE, reveals that Moffitt failed to respond to an e-mail from her GE supervisor asking her where she would be working next and also misinformed a human resources representative about her post-employment plans. See (Instrument No. 80-1 at 7, 10, 21). There is no indication that AmSpec was involved with, encouraged, or even knew of any of Moffitt's activities or discussions with GE employees. That evidence is insufficient for Plaintiff's civil conspiracy claim to survive summary judgment. See Transp. Ins. Co. , 898 S.W.2d at 278.
Accordingly, Defendants' motion for summary judgment on Plaintiff's civil conspiracy claim is GRANTED.
V.
GE moves for summary judgment on all of AmSpec and Moffitt's counterclaims against them.
A.
GE first moves for summary judgment on AmSpec's counterclaim of business disparagement. (Instrument No. 71).
To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. Forbes Inc. v. Granada Biosciences, Inc. , 124 S.W.3d 167, 170 (Tex. 2003) ; Hurlbut v. Gulf Atl. Life Ins. Co. , 749 S.W.2d 762, 766 (Tex. 1987). Unlike defamation, a claim for business disparagement always requires a plaintiff to prove actual malice. Rimkus Consulting Grp., Inc. v. Cammarata , 688 F.Supp.2d 598, 671 (S.D. Tex. 2010). A plaintiff must show that the defendant knew its statements were false or acted with reckless disregard for their falsity; acted with ill will or with an intent to interfere in the plaintiff's economic interests;
*701 and had no privilege to do so. Hurlbut , 749 S.W.2d at 766. To prove special damages, a plaintiff must provide evidence "that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." Astoria Indus. of Iowa, Inc. v. SNF, Inc. , 223 S.W.3d 616, 628 (Tex. App.-Fort Worth 2007, pet. denied) ; see also Johnson v. Hosp. Corp. of Am. , 95 F.3d 383, 391 (5th Cir. 1996) ; Hurlbut , 749 S.W.2d at 767.
GE claims that AmSpec cannot establish the first, second, and fourth prongs of its business disparagement claim. (Instrument No. 71). The only special damages AmSpec identifies in its response is lost cargo treatment revenue from sales to Statoil. (Instrument No. 76 at 17-18). Because AmSpec cannot survive summary judgment on its claim without showing special damages, the Court's analysis focuses only on communications GE employees had with Statoil.
GE claims that AmSpec cannot demonstrate that GE published false and disparaging information about it. GE's Kevin Kurtz testified that he spoke with Statoil's John Kaczka in late 2012 and again in March 2012 about the pending litigation between AmSpec and GE surrounding Moffitt's Employment Agreement. Kurtz testified that he told Kaczka, "It was unfortunate that we had legal actions against [Moffitt]. I have all the respect in the world for [Moffitt], but it is a part of the process to where since [Statoil was] named in some of the documents that I submitted, I felt that they needed firsthand to know it from me." (Instrument No. 76-3 at 13). Kurtz testified that Kaczka was not pleased and felt that tension between GE and AmSpec was not good for anyone. (Instrument No. 76-3 at 13). Moffitt echoes Kaczka's displeasure with the litigation, writing in an affidavit that "Mr. Kaczka told me that on an unspecified date, Kevin Kurtz ... informed him of the pending litigation between GE and AmSpec. Mr. Kaczka generally expressed confusion and concern about the facts communicated by Mr. Kurtz." (Instrument No. 76-13 at 3). Although Kaczka may have disliked the idea of a lawsuit between his two preferred suppliers, (Instrument No. 76-3 at 12), nothing about Kurtz's communication was false or disparaging. Kurtz testified that he only spoke about the lawsuit on a "high level," informing Kaczka that it was about Moffitt's Employment Agreement. (Instrument No. 76-3 at 13). That, of course, is true. See (Instrument No. 1, Complaint; Instrument No. 43, Amended Complaint). AmSpec cannot maintain a cause of action for business disparagement over true statements. See Forbes Inc. , 124 S.W.3d at 170 ; Hurlbut , 749 S.W.2d at 766 ; Astoria Indus. of Iowa, Inc. v. SNF, Inc. , 223 S.W.3d 616, 625 (Tex. App.-Fort Worth 2007, pet. Denied) ("In a business disparagement or false advertising case, however, there is no presumption of falsity; instead, the plaintiff has the burden of proving the falsity of the publication as part of its cause of action.").
In its attempt to show that GE published false and disparaging statements, AmSpec relies on an e-mail chain containing "talking points" from GE's counsel for GE's salespeople to relay to GE's customers. (Instrument No. 76-9 at 2-4). Specifically, Kurtz e-mailed GE's in-house counsel in April 2013 for guidance on communicating with customers about the lawsuit. (Instrument No. 76-9 at 3-4). GE's in-house counsel referred the request to GE's outside counsel in this lawsuit. (Instrument No. 76-9 at 3). GE's outside counsel wrote that GE and Moffitt had an Employment Agreement that GE believes Moffitt has not complied *702 with, and therefore GE "felt compelled to file suit to enforce the agreement." (Instrument No. 76-9 at 3). Furthermore, GE hoped its customers would remain "neutral and uninvolved," but if Moffitt "attempts to involve customers in this private dispute," GE requested that customers take "any comments by [Moffitt] with a large grain of salt." (Instrument No. 76-9 at 3). Kurtz forwarded the e-mail to his sales team and asked them to "[m]ake sure that the customers referenced in to [sic] the law suit are aware of the situation." (Instrument No. 76-9 at 2). AmSpec argues that two of the statements in the e-mail, accusing Moffitt of not complying with her Employment Agreement and asking customers to take her statements with a grain of salt, are defamatory. (Instrument No. 76 at 13). The Court need not determine whether these statements are defamatory, however, because there is no indication that Kurtz ever published either statement to anyone at Statoil. Kurtz testified he spoke to Kaczka in 2012 and again in March 2013, both times before the "talking points" e-mail. Moffitt's affidavit further supports Kurtz's description of his conversation with Kaczka, stating only that Kurtz "informed [Kaczka] of the pending litigation." (Instrument No. 76-13 at 3). Additionally, AmSpec does not allege that any of the other salespeople who received Kurtz's email ever communicated with Statoil about the lawsuit. Therefore, the Court finds that the "talking points" e-mail is no evidence of any false and disparaging statements to Statoil.
Because AmSpec cannot establish that GE published false and disparaging statements about AmSpec, GE's motion for summary judgment on AmSpec's business disparagement counterclaim is GRANTED.
B.
GE also moves for summary judgment on AmSpec and Moffitt's counterclaims for tortious interference with the employment contract between AmSpec and Moffitt. (Instrument No. 73). AmSpec and Moffitt allege that GE tortuously interfered with their contractual relationship by filing suit to enforce the restrictive covenants contained in Moffitt's Employment Agreement with GE, even though they allege that GE knew the covenants were unenforceable at the time of execution. (Instrument No. 55 at 32-33; Instrument No. 56 at 18-19).[3]
To recover for tortious interference with an existing contract, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss.
*703 Texas Beef Cattle Co. v. Green , 921 S.W.2d 203, 210 (Tex. 1996). GE claims that Defendants cannot establish the second, third, and fourth prongs of their counterclaims. (Instrument No. 73 at 6). GE also alleges that it had a legal right or a colorable legal right to seek enforcement of the restrictive covenants, making their actions justified. (Instrument No. 73 at 6). Because the Court determines that Defendants cannot establish damages, it analyzes only that issue.
GE argues that AmSpec and Moffitt cannot demonstrate that they suffered damages. First, Moffitt remains an AmSpec employee, and Defendants do not argue that her salary or benefits have decreased. (Instrument No. 73-1 at 82; see also Instrument No. 76-13). Where a plaintiff is still employed with the same salary and benefits, she has generally not suffered any injury for tortious interference with her employment contract. KTRK Television, Inc. v. Fowkes , 981 S.W.2d 779, 790 (Tex. App.-Houston [1st Dist.] 1998), disapproved of on other grounds by Turner v. KTRK Television, Inc. , 38 S.W.3d 103 (Tex. 2000).
Second, although Moffitt claims to have suffered mental anguish damages, these damages are not recoverable in an action for tortious interference with contract. See Creditwatch, Inc. v. Jackson , 157 S.W.3d 814, 818 (Tex. 2005) (noting that tortious interference with contract claims do not allow mental anguish damages) (citing Am. Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp. , 798 S.W.2d 274, 278 (Tex. 1990) ) (holding damages for tortious interference with contract are the same as damages for breach of contract interfered with, thus putting claimant in same economic position as if contract had been performed); see also Roehrs v. Conesys, Inc. , 305-CV-829-M, 2007 WL 2125654, *9 (N.D. Tex. July 25, 2007) aff'd, 332 Fed.Appx. 184 (5th Cir. 2009) (applying Creditwatch ).
Third, Defendants both claim to have suffered reputational damages. The parties agree that damages for injury to reputation are recoverable only if they are reasonably expected to result from the contractual interference. Browning-Ferris, Inc. v. Reyna , 852 S.W.2d 540, 549 (Tex. App.-San Antonio 1992, no writ), rev'd on other grounds , 865 S.W.2d 925 (Tex. 1993). Here, Defendants have shown that GE brought the lawsuit against them to enforce the non-solicitation covenant, and they have also shown a connection between the filing of the lawsuit itself and damage to Defendants' reputations. See (Instrument No. 76 at 22-23). For example, potential customers were "concerned and confused" about the lawsuit or "surprised" about Moffitt's non-solicitation agreement with GE. (Instrument No. 76 at 23; Instrument No. 76-3 at 14; Instrument No. 76-13 at 3). Defendants have also demonstrated that GE's lawsuit against them may have made Moffitt's job duties more difficult to perform. (Instrument No. 22 at 27). However, AmSpec and Moffitt have failed to articulate how GE's lawsuit, by interfering with their employment contract , caused reputational damages. As GE argues, "it is hard to conceptualize how reputational damages could even arise from increased difficulty in an employee's performance of her duties." (Instrument No. 88 at 10). The reputational injury must be reasonably expected to result from the contractual interference itself, Browning-Ferris , 852 S.W.2d at 549, and Defendants have not introduced any evidence of this. Therefore, GE is entitled to summary judgment on this counterclaim.
Accordingly, GE's motion for summary judgment on AmSpec and Moffitt's tortious interference with employment contract counterclaim is GRANTED.
C.
Lastly, GE moves for summary judgment on AmSpec's counterclaim for tortious *704 interference with its customer contracts. (Instrument No. 72). AmSpec has conceded that summary judgment is appropriate on this counterclaim. (Instrument No. 76 at 12).
Accordingly, GE's motion for summary judgment on AmSpec's tortious interference with customer contracts counterclaim is GRANTED.
VI.
Based on the foregoing, IT IS HEREBY ORDERED THAT Plaintiff and Counter-Defendant GE Betz, Inc.'s Motions for Summary Judgment are GRANTED (Instrument Nos. 71, 72, 73 ). Defendants and Counter-Plaintiffs AMSPEC Services, L.L.C. and Michelle Moffitt-Johnston's Motion for Summary Judgment is GRANTED in part and DENIED in part (Instrument No. 74 ).
The Clerk shall enter this Order and provide a copy to all parties.

Although the Employment Agreement is signed by Moffitt and dated, the date is illegible. (Instrument No. 74-9 at 5). The exact date the Employment Agreement was executed is immaterial to the outcome of this case.

In a footnote, Plaintiff claims that AmSpec may be liable as a joint tortfeasor because it knowingly participated in Moffitt's alleged fiduciary duty breaches. (Instrument No. 80 at 29 n.170). However, Plaintiff's First Amended Complaint makes no mention of AmSpec as a joint tortfeasor under this claim. See (Instrument No. 43 at 19). At this late date, Plaintiff cannot attempt to include AmSpec in its breach of fiduciary duty claim, and the Court considers the claim as it applies to Moffitt only.

In Moffitt and AmSpec's response to the motion for summary judgment, they attempt to claim two independent acts of interference: filing suit in this case and making defamatory comments regarding Moffitt and AmSpec. (Instrument No. 76 at 20). GE objects to this second claimed act of interference, noting Defendants raise this issue for the first time in their response. (Instrument No. 88 at 7; See also Counterclaims, Instrument No. 55 at 32-33; Instrument No. 56 at 18-19). Moffitt and AmSpec's counterclaims plainly articulate a sole basis for their tortious interference claims: GE's attempt to enforce restrictive covenants by filing the instant lawsuit. (Instrument No. 55 at 32-33; Instrument No. 56 at 18-19). "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."Cutrera v. Bd. of Supervisors of La. State Univ. , 429 F.3d 108, 113 (5th Cir. 2005) ; see also Criner v. Texas-New Mexico Power Co. , 470 Fed.Appx. 364, 371 (5th Cir. 2012). Therefore, the Court declines to consider Moffitt and AmSpec's second theory of liability on their tortious interference claim.